397 So.2d 1258 (1981)
STATE of Louisiana
v.
Ronald MONROE.
No. 80-KA-2137.
Supreme Court of Louisiana.
April 6, 1981.
Rehearing Denied May 18, 1981.
*1263 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Lance Africk, Louise Korns, and John H. Craft, Asst. Dist. Attys., for plaintiff-appellee.
John Lawrence, and Dwight Doskey, of Orleans Indigent Defender Program, New Orleans, for defendant-appellant.
DIXON, Chief Justice.
Ronald Monroe was convicted of first degree murder, R.S. 14:30, and sentenced to death in conformity with Louisiana's capital sentencing procedure. C.Cr.P. 905 et seq. There is no merit to any of the thirty-seven assignments of error. Additionally, after reviewing the sentence imposed, we find that in this case the death penalty is not an excessive sentence. The conviction and sentence are affirmed.
The murder victim was Lenora Collins, defendant's next door neighbor. Ms. Collins occupied one half of a shotgun double, and defendant's family occupied the other half. The murder occurred at approximately 3:00 a. m. on September 10, 1977. The victim and her children, Joseph, aged twelve, and Theodise, aged eleven, were sleeping in the victim's bed. The victim *1264 awoke when she heard someone enter through the bedroom window. She turned on the light, began struggling with the defendant, and cried for Joseph to get help.
Theodise tried to find something with which to hit the defendant, but she fell down. The defendant stabbed Theodise in the back, telling her he would kill her. Theodise managed to lock herself in the bathroom where she remained until her mother called out for help. Upon reentering the bedroom, Theodise saw her mother reach for the phone then fall to the floor. Ms. Collins had been stabbed seven times, and three of the wounds were the cause of her death.
The evidence adduced at trial consisted of the testimony of the two children. Both had known the defendant for several years, and both identified him as their mother's assailant. The state presented evidence that the defendant's motive for the murder was anger over being evicted because Ms. Collins' mother had recently purchased the residence. Monroe unsuccessfully offered an alibi defense, according to which he was drunk and sleeping in his bed at the time of the murder.

Assignment of Error No. 1
By this assignment defendant contends that the trial judge erred in overruling his motion to quash the petit jury venire for January, 1980. He claims he was prejudiced by a newspaper account of a surge of homicides in New Orleans during January, 1980. He contends that the "prospective jurors have read these news items and are exposed to such publicity concerning crime in New Orleans that the defendant cannot get a fair trial." Even assuming that defendant could have proved his allegations, which he made no attempt to do, the judge's action was proper. A petit jury venire can be set aside only for fraud. C.Cr.P. 419. Prejudicial publicity can provide grounds for a change of venue, C.Cr.P. 622, but does not entitle a defendant to set aside an entire petit jury venire.
Defendant also alleges that the January, 1980 venire was tainted because of conversations between jurors and assistant district attorneys which left the jurors with "the impression that other defendants who either do not take the stand or do not inform the jury of any allegations of crime attributed to them are not being truthful to the jury." The trial judge properly denied defendant's motion since no proof was offered by the defendant to substantiate this allegation. See State v. Sheppard, 350 So.2d 615 (La.1977).
This assignment of error lacks merit.

Assignments of Error Nos. 2 and 8
By Assignment No. 2 defendant contends that C.Cr.P. 798(2) is unconstitutional because it deprived him of his right to a trial by a jury selected from a fair cross section of the community. This court rejected this argument in State v. Kelly, 375 So.2d 1344, 1348 (La.1979), and has repeatedly permitted the exclusion of jurors properly challenged under C.Cr.P. 798(2) for conscientious scruples against capital punishment. See State v. Martin, 376 So.2d 300, 306 (La.1979).
By Assignment No. 8 defendant contends that jurors challenged for cause under C.Cr.P. 798(2) were not held to the requirements of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The record shows that the jurors were held to the Witherspoon standard.
These assignments lack merit.

Assignments of Error Nos. 3 and 19
These assignments concern the admissibility of items seized during defendant's arrest. He argues that, because the officers arrested him from his mother's home without first obtaining a warrant, their entry into the home was unlawful under Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), and State v. Brown, 387 So.2d 567 (La.1980).[1] *1265 Defendant's reliance upon these cases is misplaced. Payton v. New York, supra, does not proscribe every warrantless entry into private premises to effect arrests.
In the instant case, the officers first learned of the murder at 3:22 a. m. They soon arrived at the scene, and were told by the children of the victim that the defendant, who lived next door, was the assailant. The officers knocked at the door of defendant's home at 4:00 a. m. and asked his mother if defendant was there. After entering the home, they arrested defendant from his bedroom. They noticed that defendant's bedspread had fresh blood stains on it so they seized it. Additionally, they seized a bloody dish towel from the kitchen garbage can.
We reject defendant's argument that there were no exigent circumstances justifying the warrantless entry which occurred in this case. The officers had probable cause to believe that defendant had stabbed a woman to death only moments before, in the same building. The murder weapon had not been recovered. Unlike the situations presented in Payton v. New York, supra, and State v. Brown, supra, there was no time to obtain a warrant here. This case is closer to State v. Abadie, 390 So.2d 517, 520 (La.1980), in which we stated:
"... It has long been recognized that police acting with probable cause may effect warrantless entries to search and arrest when confronted with a situation, such as here, in which prompt action is necessary to prevent the flight of alerted suspects and possible destruction or removal of evidence. Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). The Payton decision only barred warrantless arrests following non-consensual entry into the suspect's house under circumstances in which there was no justification for the officers' failure first to present their facts to a neutral magistrate and to obtain judicial approval prior to the invasion of the suspect's house. Here, there was plainly no time for that procedure, since suspects were scampering away and evidence was within the immediate view of the police. The entry to arrest and to secure the safe was clearly supported by probable cause and was reasonable under the circumstances, despite the absence of prior judicial approval."
These assignments lack merit.

Assignments of Error Nos. 4 and 10
By Assignment No. 4 defendant complains of the trial judge's denial of his motion for individual voir dire and sequestration of jurors during voir dire. The burden is on the defendant to show special circumstances indicating why individual voir dire is warranted. Because defendant made no such showing, the trial judge did not abuse his discretion in denying the motion. State v. Berry, 391 So.2d 406, 411 (La.1980) (on original hearing); State v. Dominick, 354 So.2d 1316, 1321-22 (La. 1978).
In Assignment No. 10 the defendant claims the trial judge erred in denying his motion for mistrial when a prospective juror stated, "I don't think [the defendant] would be here if the district attorney didn't think he did something." The defendant claims that, since the jurors heard this remark, *1266 they were influenced by it, and consequently defendant could not receive a fair trial.
The jurors who were chosen swore to accept the law as given to them by the judge. They were instructed on the presumption of innocence. Implicit in defendant's argument is the assumption that, because the jurors heard this remark, they were unable to accept the law as given to them by the judge. We do not believe this prospective juror's statement could have had such an impact. The complained of remark was a typical misconception of the lawthe type that voir dire is designed to dispel.
These assignments lack merit.

Assignment of Error No. 5
Defendant argues in this assignment that the trial judge erred in denying his motion for funds to hire a pathologist and a fingerprint expert. The burden is on the defendant to show that he is unable to obtain existing evidence crucial to the defense. State v. Madison, 345 So.2d 485, 490 (La.1977). No such showing was made in the instant case. Nor does counsel in his brief allege that defendant was prejudiced by his inability to hire a pathologist or a fingerprint expert. Furthermore, we do not see how defendant could possibly have been prejudiced. No fingerprint evidence was introduced at trial because the fingerprints obtained from the victim's residence were too smudged. And, the defendant relied upon an alibi defense at trial. The cause of death, time of death, and extent of wounds were not contested by the defendant.
This assignment lacks merit.

Assignments of Error Nos. 6 and 25
In these assignments of error defendant contends that R.S. 14:30 and C.Cr.P. 905 to 905.9 are unconstitutional because they deprive a defendant of due process. This court has noted in State v. Williams, 383 So.2d 369, 373 (La.1980), that our capital sentencing law is modeled after the Georgia statute upheld by the United States Supreme Court in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed. 2d 859 (1976).
These assignments lack merit.

Assignments of Error Nos. 12, 13 and 16
Assignments Nos. 12 and 13 concern the trial judge's denial of defendant's motion for mistrial during the testimony of Officer Fred Dantagna, who testified for the state. The basis for the objection was hearsay testimony by Dantagna to the effect that the victim's children had identified defendant as their mother's assailant. Assignment No. 16 concerns hearsay testimony by the victim's sister in which she related that the children had identified the defendant as the perpetrator.
We agree that the testimony constituted inadmissible hearsay and should not have been admitted. The trial judge erred. Nevertheless, both children testified at trial and identified the defendant. Thus, the hearsay remarks were merely cumulative and corroborative of the children's testimony. The children were available for cross-examination, and the defendant's confrontation rights were not abridged. State v. McMahon, 391 So.2d 1120 (La.1980).
These assignments are without merit.

Assignments of Error Nos. 14 and 15
Theodise Collins, the victim's daughter, related how she had hidden in the bathroom until her mother called out to her. She then observed her mother reach for the phone and fall to the floor. The prosecutor asked, "Now what was your mama's condition, Theodise when she was laying (sic) on the floor?" Defense counsel objected that the question called for information outside the witness' knowledge. The objection was overruled, and the witness replied that her mother was bloody. According to the transcript, the witness then began to cry.
Assignment No. 14 concerns the trial judge's overruling the objection to the prosecutor's question on the mother's condition. The question was apparently designed *1267 to elicit a description of the victim's physical appearance. Since the witness had observed her mother, this was a fact within the witness' knowledge. R.S. 15:463. Counsel in brief attempts to object to the relevancy of the question, but since this ground was not urged at trial, that matter is not properly before us. C.Cr.P. 841; State v. Davis, 357 So.2d 1125 (La.1978).
By Assignment No. 15 defendant complains that photographs of the victim were shown to the witness in order to cause her to cry. The transcript indicates that the witness declared that her mother was bloody, then began to cry, then a few moments later the objection regarding the photographs was lodged. It does not appear that the showing of the photographs preceded the witness' crying. Nor does the record reveal whether the photographs in fact were shown to the witness. Nor is it clear whether the photographs in fact were merely snapshots of the victim or whether they were pictures taken on the night of the murder.
These assignments lack merit.

Assignment of Error No. 17
By this assignment defendant complains that, since motive is not an element of the crime of first degree murder, the trial judge erred in admitting certain documentary evidence that tended to prove motive for the killing.[2] The threshold for admissibility is relevance to a material issue. R.S. 15:435. Motive is relevant to explain the actions of the accused and to show the intent with which he acted. I. J. Wigmore, Evidence § 118 (3d ed. 1940).
This assignment lacks merit.

Assignments of Error Nos. 18 and 20
By these assignments defendant contends that the trial judge committed reversible error by admitting into evidence five photographs which defendant says are gruesome. There is no merit to this argument. All five photographs are in black and white, and only one is of the victim. One photograph depicts an overturned coffee table and a telephone which had been yanked off the wall, while another shows the blood stained sheets. The remaining two are innocuous photographs of items in the bedroom. The trial judge did not abuse his discretion when he allowed these five photographs to be admitted into evidence.
These assignments lack merit.

Assignment of Error No. 21
This assignment concerns the trial judge's characterization of testimony by Delores Monroe, the defendant's mother, as inadmissible hearsay. The witness sought to relate the details of a conversation between Theodise Collins, the victim's daughter, and George Stenson, the victim's former lover. During the conversation, which allegedly occurred on the day before the murder, Stenson told Theodise that he would return to see Ms. Collins later that evening. Defendant contends that the statement's introduction was sought to impeach the statement by Theodise that she didn't remember talking to Stenson on the day before the murder.
Even assuming that Theodise's statement was susceptible of impeachment and that a proper foundation for impeachment was laid, the testimony was properly excluded. If counsel's purpose was to impeach Theodise's credibility by showing that her memory was fallible, then the impeachment occurred when Mrs. Monroe testified that she saw Stenson talking to Theodise on the day of the murder. Further testimony by Mrs. Monroe on the conversation would be impeachment as to a collateral fact. R.S. 15:494.
This assignment lacks merit.

*1268 Assignment of Error No. 22

By this assignment defendant contests the trial judge's ruling that state rebuttal witness Willie Miller could testify that Delores Monroe had asked him to lie at trial about defendant's whereabouts on the night of the murder. Despite defense counsel's claim that the testimony constituted inadmissible hearsay, the trial judge ruled that the testimony was admissible to impeach Mrs. Monroe's credibility.
R.S. 15:492 authorizes the impeachment of a witness by showing his bias, interest, or corruption in relation to the instant prosecution. Since Mrs. Monroe on cross-examination denied that she had asked Miller to testify on the defendant's behalf, a proper foundation was laid for the introduction of extrinsic evidence to show her bias, interest, or corruption. State v. Elzie, 351 So.2d 1174, 1177 (La.1977).
This assignment lacks merit.

Assignment of Error No. 23
This assignment concerns two remarks by the prosecutor during rebuttal argument. The defendant contends that the trial judge should have declared a mistrial because the remarks were prejudicial. The first remark was a statement concerning the children's credibility. The prosecutor said, "No interest to lie whatsoever. Now you saw Theodise crying on that stand at the end." This is permissible argument. Demeanor and motive are factors affecting credibility, and argument on credibility is permitted under C.Cr.P. 774. See State v. Sayles, 395 So.2d 695 (La.1981).
The second remark was the statement that "there is one other witness who would testify that [the defendant] was there that night, and that would be Lenora Collins." That the victim of a murder cannot testify at trial is tautological. Whether the victim would have identified the defendant as her assailant is the primary issue for the jury to decide. This was improper argument. Nonetheless, before this court will overturn a conviction because of improper argument, there must be convincing proof that the jury was influenced by the remarks and that the remarks contributed to the verdict. State v. Carthan, 377 So.2d 308 (La.1979).
The state's case against the defendant consisted of the eyewitness identifications by the victim's two children, both of whom were present when the assailant broke into their mother's bedroom. The defense consisted of alibi testimony to the effect that the defendant had been drinking on the evening of the murder but was "sleeping it off" at the time Ms. Collins was killed. The jury's decision to accept the children's testimony and thereby reject the alibi defense could not possible have been attributable to the complained of remark by the prosecutor during rebuttal argument.
This assignment lacks merit.

Assignment of Error No. 24
By this assignment of error defendant contends that the trial judge committed reversible error when he rejected eleven of defendant's requested special charges. The applicable law is contained in C.Cr.P. 807, which provides in part:
"A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given."
Defense counsel in brief argues that, although requested charges numbered one through four were included in the court's general charge, the trial judge erred in deleting portions of defendant's requested charge. This contention lacks merit. The only substantial omission concerns requested Charge No. 4 on identification. The trial judge deleted the portion dealing with accuracy of identification. The omitted material was not a statement of law but rather an unsubstantiated opinion on the hazards of mistaken identity.
Special Charge No. 6 on intoxication was correctly rejected because it is an erroneous statement of law. The trial *1269 judge properly charged the jury on R.S. 14:15, which details the limited instances in which intoxication is a valid defense.
Requested Special Charge No. 8 contained a definition of reasonable doubt. Defendant contends that, although the judge charged the jury on the definition of this term, the defendant's proffered definition was better. We do not agree. The judge's charge explained in detail how the jury is not restricted to the evidence in finding a reasonable doubt. Defendant's definition omitted this explanation, and used as examples the two grounds upon which defendant hoped to instill a reasonable doubt. It would have been improper for the judge to have used the facts of this case as his definition in the general charge. C.Cr.P. 806.
By requested Charge No. 10 defendant objected to the trial judge's characterization of reasonable doubt as involving "serious doubt" and "grave uncertainty." These phrases, when viewed in the context of the trial judge's entire charge on reasonable doubt, constitute an accurate statement of the law.
Requested Special Charge No. 12 was designed to assist the jury in applying the concept of reasonable doubt to a decision where such lesser included verdicts are not responsive. The judge properly excluded this charge since the possibility of such a situation did not occur until 1978, after this offense was committed.[3]
Requested Special Charge Nos. 13-15 involve the proof of specific intent. The trial judge properly charged the jury that specific intent can be inferred from the circumstances of the transaction. R.S. 15:445; State v. George, 346 So.2d 694, 707 (La.1977). Defendant's proffered charge was inaccurate in that it would have disallowed the inference unless there existed external signs of specific intent apart from the mere fact of killing.
This assignment of error lacks merit.

Assignment of Error No. 28
By this assignment defendant claims that the trial judge erred in overruling his objection to the prosecutor's remark during cross-examination of one of the defendant's expert witnesses during the sentencing phase. The witness was asked, "Have you been in this building for three years prosecuting cases and seeing the crime that is going through this city?" The question was provoked by the witness' assertion that his own beliefs were better grounded in research than the prosecutor's. The prosecutor's remark, while unnecessarily argumentative, was not of such a nature as to prejudice the jury against the defendant. C.Cr.P. 771.
This assignment lacks merit.

Assignments of Error Nos. 29-32
In Assignment No. 29 defendant contests the overruling of his motion for mistrial because of improper prosecutorial argument. In his closing argument during the sentencing phase, the prosecutor compared the instant murder to a butcher's slaughter of a calf. There were facts in the record to support this comparison. The victim sustained three eight inch knife wounds, one of which completely severed a rib. She lost at least two quarts of blood which was spattered about the house. The remark, though crude, trite and graphic, did not exceed the permissible scope of argument. C.Cr.P. 774; State v. Governor, 331 So.2d 443, 451 (La.1976).
This assignment lacks merit.
Assignment No. 30 concerns a remark by defense counsel during his closing argument at the sentencing hearing. He said that, since the defendant is an indigent, he would not have the "pull" to ever obtain a pardon. Defendant contends that reversible error occurred when the trial judge sustained the state's objection to the *1270 remark. Defense counsel maintains that the remark was designed to convey to the jurors that a life sentence really means a life sentence. It was probably wrong for the prosecutor to object to such a self-evident remark, and probably error to sustain the objection. Nevertheless, the argument was made, and the jury heard it. Sustaining the objection could not have erased the idea argued by defense counsel.
This assignment lacks merit.
Assignment No. 31 concerns a reference by the prosecutor in his closing argument in the sentencing phase to the fact that death cases are reviewed by the Louisiana Supreme Court:
"... And the law says in this State that the death penalty is appropriate in this instance. Now, the top of the Louisiana legislature decision, the Louisiana Supreme Court reviews each and every case in which the death penalty is imposed...."
Defendant assigns error to the trial judge's overruling of his objection to this reference to appellate review. In State v. Berry, supra, (per curiam denial of rehearing), this court declined to impose an absolute prohibition against such remarks, and adopted instead a case-by-case approach. The danger inherent in such references is that the jury might be induced to disregard its responsibility. This court in Berry stated:
"... If the reference conveys the message that the jurors' awesome responsibility is lessened by the fact that their decision is not the final one, or if the reference contains inaccurate or misleading information, then the defendant has not had a fair trial in the sentencing phase, and the penalty should be vacated." 391 So.2d at 418.
In the instant case, the reference to appellate review was preceded by an explanation of the narrow circumstances under which the death penalty has been deemed appropriate by the legislature and the courts. The prosecutor stressed that the jury must remain within specific guidelines and must find the existence of at least one aggravating circumstance before recommending death. He urged the jurors to impose death, but his argument did not minimize the primary duty of the jury because of appellate review. Rather, he argued that the facts of this case fell within those narrow circumstances under which death is an appropriate penalty. The argument did not serve to lessen the significance of the jury's role.
This assignment lacks merit.
Assignment No. 32 is taken to the entire rebuttal argument of the prosecution on the sentencing phase. Defense counsel's closing argument was a generalized attack on the deterrence function of the death penalty. Echoing the testimony of one of the defense's expert witnesses, counsel stressed that it is the certainty, and not the severity of punishment that serves as a deterrent. The prosecution's rebuttal was designed to explain how death has been deemed an appropriate penalty only under narrow circumstances, and that since the facts of this case fell within those circumstances, death was appropriate.
In explaining to the jury why the state sought the death penalty, the prosecutor asked the jury "to give us justice." The substance of his argument was that since the victim was unjustly killed, her killer should be executed. Some of the closing argument might be interpreted as a plea for the jury to disregard the constitution and the law, and simply do to the defendant what they had found out the defendant had done to the victim, and take his life. The prosecutor tried to say that in asking for the death penalty, he asked for "nothing out of the ordinary," and that the jury should simply give the defendant the same that the defendant gave the victim.
If it were not evident (see discussion under Assignment of Error No. 33) that this jury came close to a deadlock on the penalty, the remarks of the district attorney in closing argument would not have assumed such importance. Although there is overwhelming proof of defendant's guilt, it is by no means overwhelmingly certain that the jury would have brought in a recommendation *1271 for death in the absence of any persuasive material in the record.
Oral argument of lawyers is of obvious importance in a jury case. The lawyers on each side are obligated to attempt to persuade the jury that their respective positions are correct. The practice of law, however, is an art that requires a degree of sophistication and discrimination; there are ways to persuade other than to appeal to base emotions.
A system of capital punishment which permits the exaction of an eye for an eye, a tooth for a tooth, and a life for a life will not pass constitutional muster. Such argument is improper. To seem to urge a jury to do to the defendant what the defendant had done to the victim (to murder him?) is improper. To refer to the death penalty as "nothing unusual," and as not a harsh penalty is inaccurate.
When this argument is considered as a whole, it loses much of its objectionable flavor. Almost all of it was in answer to arguments made by the defense. The subjects covered in the rebuttal were not inappropriate. An intelligent jury could not reasonably have believed that the prosecutor was urging them to disregard the law as given to it in the instructions of the trial judge.
There is no reversible error in these assignments.

Assignment of Error No. 33
During the sentencing hearing the jurors deliberated forty-five minutes, then announced to the trial judge that they were hung. They requested additional instructions on the procedure to follow in the event that unanimity could not be obtained. The jurors were instructed that if a jury is unable to agree within a reasonable time, the trial judge must impose a sentence of life imprisonment. The judge announced that in his opinion forty-five minutes was a relatively short period of time, but he declined to set arbitrary time limits on what constitutes a reasonable time. After additional deliberation for an hour, the jury unanimously recommended death.[4]
Defense counsel lodged an objection when the jurors were allowed to resume deliberations after their announcement that they were hung. Counsel argued to the judge that under C.Cr.P. 905.8 a trial judge is vested with no discretion to allow additional deliberations. Counsel has expanded the grounds for his objection in brief and in oral argument before this court. He asserts that, by informing the jurors of the effect of deadlock and allowing further deliberations, the trial judge implied that he wanted the jurors to impose the death penalty in this case.
The first issue presented in this assignment is whether the trial judge is vested with discretion to allow a jury to continue deliberations once that jury has announced that it is hung. The applicable statute, C.Cr.P. 905.8, does not address the issue. The trial judge in this case imposed the requirement that a reasonable time must elapse before a jury can be declared to be deadlocked. Under defense counsel's interpretation, the judge lacks power to allow additional deliberations. Under this construction a jury determination that it is hung after a few minutes of deliberation must be observed. This construction is unacceptable. *1272 Rather, we believe that implicit in this statute is the concept that the trial judge is the one who determines when a jury is deadlocked. His decision will not be overturned except upon a showing of palpable abuse of discretion. State v. Governor, supra. No abuse has been shown here.
The second issue presented concerns the combined impact of the judge's decision to allow further deliberations and his mid-deliberation charge on the effect of deadlock. The argument is advanced that, since the jurors were aware that the defendant would receive life imprisonment regardless of their recommendation, they must have surmised that they were being sent back because the judge wanted them to recommend the death penalty. Careful examination of the trial judge's instructions to the jurors is convincing that this argument is without merit. The trial judge told the jurors that if they could not agree despite further deliberations, they should tell him so.
This assignment lacks merit.

Assignments of Error Nos. 34 and 37
By Assignment No. 34 defendant contends that the trial judge erred in accepting the jury's sentence recommendation. By Assignment No. 37 defendant contends that imposition of the death penalty in this case is unconstitutional because, under the facts, it constitutes cruel and unusual punishment. These assignments are covered in the section entitled sentence review, infra.

Assignment of Error No. 35
By this assignment defendant contends that the trial judge erred in denying his motion for new trial. Five grounds were asserted in this motion. These grounds are duplicative of Assignments of Error Nos. 4, 34, 36, 33 and 1, which have been found to be without merit. They are discussed elsewhere in this opinion.
This assignment lacks merit.

Assignments Neither Briefed Nor Argued
Because this is a capital case, the court reviews those assignments of error which are neither briefed nor argued. State v. Jones, 332 So.2d 466 (La.1976).
By Assignment No. 7 defendant claims the trial judge erred when he denied defendant's motion for bail. The motion was filed after defendant's indictment, so the burden was on him to "show that the proof is not evident or the presumption is not great." C.Cr.P. 313. The evidence against defendant consisted of the testimony of two eyewitnesses. Therefore, it is highly improbable that defendant could have met the burden imposed by C.Cr.P. 313. This assignment lacks merit.
Assignment No. 9 concerns defendant's unsuccessful motion for mistrial because of the unexplained absence of a potential juror whose name was called from the petit jury venire. The grounds for mistrial listed in C.Cr.P. 775 do not include the above situation, and no prejudice was asserted by defendant because of this potential juror's absence. This assignment lacks merit.
By Assignment No. 11 defendant alleges that the trial judge erred in allowing a state challenge for cause of a juror (No. 21), Jeanmarie Belonga. The record discloses, however, that the state exercised a peremptory challenge on this prospective juror. It appears from the record that the parties were in the process of selecting an alternate juror when the state exercised a peremptory challenge. The record does not disclose how many peremptory challenges were allowed each party. Nor did defendant's objection complain that the state had exceeded the number of peremptory challenges granted it for the selection of the alternate juror. C.Cr.P. 789. Rather, defendant's objection complained that the juror was "well qualified." This assignment appears to lack merit.
Assignment No. 26 provides: "The court committed reversible error in allowing the same testimony and evidence to be admitted at the bifurcated hearing as was *1273 introduced by the State in the part of the trial relative to guilt or innocence." This assignment is palpably without merit. C.Cr.P. 905.2 specifically authorizes the jury to "consider any evidence offered at the trial on the issue of guilt." Further, our statute was derived from the Georgia statute specifically approved by the United States Supreme Court in Gregg v. Georgia, supra. This assignment is without merit.
Assignment No. 27 concerns the admission of a photograph of the decedent at the sentencing phase. Defendant contends that the trial judge committed reversible error in admitting the photograph because it is "gruesome and prejudicial." Photographs of the victim are probative of "the circumstances of the offense," which is by law the focus of the sentencing hearing. C.Cr.P. 905.2. This assignment lacks merit.
By Assignment No. 36 defendant contends that the trial judge erred in denying his motion in arrest of judgment. The motion was based on two arguments, one of which formed the basis of Assignment of Error No. 33, discussed elsewhere in this opinion and found to be without merit. The second ground asserts that the trial judge erred in informing the jury during the guilt phase that it could consider the responsive verdict of second degree murder because of this court's decision in State v. Booker, 385 So.2d 1186 (La.1980). Defendant's reliance upon Booker is misplaced. That case concerned the 1978 legislative revision of the second degree murder statute. 1978 La.Acts, No. 796, amending R.S. 14:30.1. The instant murder occurred in the early morning hours of September 10, 1977. The 1977 amendment to the second degree murder statute had become effective on September 9, 1977. 1977 La.Acts, No. 121, amending R.S. 14:30.1. The 1977 amendment was not confined to felony murder, but included a provision on specific intent murder. Thus, the second degree murder statute applicable to the instant prosecution was responsive to the charge of first degree murder. Furthermore, second degree murder is a noncapital offense, and could have only benefitted defendant. Since the jury found defendant guilty of first degree murder, there could have been no prejudice. This assignment lacks merit.

Sentence Review
This court reviews every death sentence to determine if it is excessive. C.Cr.P. 905.9. In evaluating whether the death penalty is excessive in a particular case, the court determines:
"(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Supreme Court Rule 28, § 1.
There is no evidence that passion, prejudice or any other arbitrary factor influenced the jury in its recommendation of death. Both the victim and the defendant are black.

Aggravating Circumstances
The jury in the instant case found three of the aggravating circumstances listed in C.Cr.P. 905.4 to be present:
"(a) The offender was engaged in the perpetration or attempted perpetration of aggravated rape, aggravated kidnapping, aggravated burglary, or armed robbery;
. . . . .
(d) The offender knowingly created a risk of death or great bodily harm to more than one person;
. . . . .
(g) The offense was committed in an especially heinous, atrocious or cruel manner." (C.Cr.P. 905.4 (as it appeared prior to 1979 La.Acts, No. 74, § 2)).
Each of these aggravating circumstances will be discussed separately.

C.Cr.P. 905.4(a)
The jury found that the murder occurred while the defendant was engaged *1274 in the perpetration of an aggravated burglary. R.S. 14:60. The record evidence supports this finding. The defendant unlawfully entered the victim's bedroom through a window. He was armed with a knife which he used to stab both the murder victim and her daughter. Defendant does not contest the jury's finding on this aggravating circumstance, but argues that since the burglary was committed to facilitate the murder, the underlying burglary should be disregarded.
The thrust of defendant's argument is that a murderer who breaks into his victim's home in order to commit the murder is no more deserving of death than a murderer who waits for his victim to come out onto the porch or who shoots his victim by aiming his gun into the window. He points out that aggravated kidnapping, aggravated rape and armed robbery, the other crimes listed in C.Cr.P. 905.4(a),[5] cannot be committed with homicide as the only end result. He thus argues that the legislature did not intend for aggravated burglary to be an aggravating circumstance if the only motive in committing the burglary was murder of the victim.
Defendant's argument disparages the seriousness of the offense of aggravated burglary. The legislature has determined that aggravated burglary is a distinct crime, the maximum penalty for which is thirty years at hard labor. R.S. 14:60. It is not unreasonable to conclude that the legislature deemed it more reprehensible to break into a home and kill the occupant than to commit murder in a public place.[6] We therefore reject defendant's argument.

C.Cr.P. 905.4(d)
The jury found that the defendant "knowingly created a risk of death or great bodily harm to more than one person." C.Cr.P. 905.4(d). This aggravating circumstance was proved beyond a reasonable doubt. Theodise Collins, the decedent's daughter, testified that she was stabbed in the back by the defendant who told her he was going to kill her. In State v. Culberth, 390 So.2d 847, 850 (La.1980), we noted that "this aggravating circumstance is established when the defendant by a single and consecutive course of conduct contemplates and causes a great risk to more than one person." This circumstance was found not to exist in Culberth because the defendant, although telling an intended victim, "you're next," did not pursue the man when he ran behind a car. In the instant case, however, Theodise was actually pursued and stabbed by the defendant, and was hospitalized for almost two weeks for a collapsed lung. Thus, we conclude that the jury properly found C.Cr.P. 905.4(d) proved beyond a reasonable doubt.

C.Cr.P. 905.4(g)
Although the jury found the instant offense to have been committed in an "especially heinous, atrocious or cruel manner," this finding cannot stand. It is true that *1275 the murder was brutalthe victim lost over two quarts of blood, her lungs were punctured and one of her ribs was severed. Her death was not instantaneous, and she lived long enough to call out for her daughter and reach for the telephone.
Nonetheless, in order for a murder to be "especially heinous," there must exist evidence that there was "torture or the pitiless infliction of unnecessary pain on the victim." State v. English, 367 So.2d 815, 823 (La.1979). State v. Clark, 387 So.2d 1124 (La.1980), provides an example of what is meant by "especially heinous." In that case the defendant stabbed the victim thirty-five times before shooting him with a gun. In the instant case, the "wounds were inflicted to kill, not to main or to inflict pain." State v. Culberth, supra, at 851. While there is some evidence in this case that the offense was heinous and cruel, it was not proved beyond a reasonable doubt that the instant offense was especially heinous.
Having found the evidence insufficient to support one of the statutory aggravating circumstances, we must decide whether the sentence imposed by the jury can stand. Appellant argues that this court is without power to affirm a death sentence if one of the aggravating circumstances found by the jury does not exist. We have never directly addressed this issue, although in two cases we declared it unnecessary to consider whether the evidence supported all the aggravating circumstances so long as one aggravating circumstance was proved beyond a reasonable doubt. State v. Williams, supra, cert. denied, ___ U.S. ___, 101 S.Ct. 899, 66 L.Ed.2d 828 (1981); State v. Martin, supra, cert. denied, ___ U.S. ___, 101 S.Ct. 540, 66 L.Ed.2d 297 (1980).
Defendant urges this court to follow the reasoning of the Court of Appeals for the Fifth Circuit in Stephens v. Zant, 631 F.2d 397 (5th Cir. 1980). In that case the Fifth Circuit held unconstitutional a death sentence "imposed when one of the aggravating circumstances was later held to be unconstitutional even though there were two other aggravating circumstances, either of which by itself would be legally sufficient to permit the jury to impose the death penalty and as to which there is no uncertainty." Id. at 406.
Petitioner Stephens, convicted of murder, was sentenced to death by a Georgia jury which found three statutory aggravating circumstances. Although one of the circumstances was declared unconstitutional after Stephens' conviction, Arnold v. State, 236 Ga. 534, 224 S.E.2d 386 (1976), the Georgia Supreme Court affirmed Stephens' sentence because "the evidence supports the jury's findings of the other aggravating circumstances ..." Stephens v. State, 237 Ga. 259, 262, 227 S.E.2d 261, 263, cert. denied, 429 U.S. 986, 97 S.Ct. 508, 50 L.Ed.2d 599 (1976).
Stephens first sought habeas corpus relief in the Georgia state courts. In his petition he reiterated his claim that the jury's consideration of the unconstitutional statutory aggravating circumstance vitiated the sentence. The Georgia Supreme Court based its denial of relief on the provisions of its capital sentencing law. Stephens v. Hopper, 241 Ga. 596, 247 S.E.2d 92 (per curiam), cert. denied, 439 U.S. 991, 99 S.Ct. 593, 58 L.Ed.2d 667 (1978). The provision declared unconstitutionally vague had allowed the jury to consider as a statutory aggravating circumstance the fact that "the offense of murder was committed by a person who has a substantial history of serious assaultive criminal convictions." Ga.Code Ann. § 27-2534.1(b)(1). However, under Georgia law, in capital cases, a defendant's criminal record is before the jury for its consideration regardless of whether it arguably evidences a "substantial history of serious assaultive criminal convictions." See Ga.Code Ann. § 27-2503(a). Thus, the jury would have been apprised of, and could have legally considered, Stephens' criminal record in any event.
The Georgia court's treatment of Stephens' claim appears appropriate in the context of Georgia's capital sentencing scheme, in which the jury's finding of a statutory aggravating circumstance functions as a threshold for the death penalty. If the jury *1276 finds one of the enumerated aggravating circumstances to have been proved beyond a reasonable doubt, then it is authorized to consider the death penalty as the sentence in the case. In determining the appropriate penalty, the jury is authorized to consider, in addition to the statutory aggravating circumstances, "any mitigating circumstances or aggravating circumstances otherwise authorized by law." Ga.Code Ann. § 27-2534.1(b). Since Stephens' prior criminal record is a nonstatutory aggravating circumstance which the jury is authorized to consider, Ga.Code Ann. § 27-2503(a), the jury is entitled to base its recommendation in part upon that criminal record. See also Hardy v. State, 245 Ga. 272, 264 S.E.2d 209 (1980).[7]
Because Stephens' jury could legally consider his prior criminal record, and because there were other valid statutory aggravating circumstances, Stephens' sentence was not impaired. His prior criminal record is highly probative and relevant to the jury's determination of the character of the defendant, a primary focus in the sentencing hearing. Of course, the imposition of death would be unconstitutional if the jury's recommendation were based exclusively upon an invalid statutory circumstance, regardless of whether the provision were invalid on its face or as applied to a particular set of facts. Cf. Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).
In vacating Stephens' death sentence, the Fifth Circuit noted that the "presence of the unconstitutionally vague circumstance also made it possible for the jury to consider several prior convictions of petitioner which otherwise would not have been before it." Stephens v. Zant, supra, at 406. Nevertheless, those prior convictions were properly before the jury for its consideration. In spite of the finding of the Fifth Circuit in Stephens v. Zant, even if prior convictions cannot be used as "aggravating circumstances," they will be before the jury by virtue of Ga.Code Ann. § 27-2503(a). Stephens v. Zant, therefore, is not persuasive.
At present we know of no constitutional requirement that a death sentence be vacated whenever the jury errs in its finding of a statutory aggravating circumstance.[8] We note that the Georgia legislature has directed the Georgia Supreme Court to determine whether "the evidence supports the jury's or judge's finding of a statutory aggravating circumstance ...," Ga.Code Ann. § 27-2537(e) (emphasis added), and that this provision was quoted with approval in Gregg v. Georgia, supra. As stated by the Georgia Supreme Court in Gates v. State, 244 Ga. 587, 599, 261 S.E.2d 349, 358 (1979):
"Where two or more statutory aggravating circumstances are found by the jury, the failure of one circumstance does not so taint the proceedings as to invalidate the other aggravating circumstance found and the sentence of death based thereon. Gregg v. State, 233 Ga. 117, 127-128, 210 S.E.2d 659 (1974); Gregg v. Georgia, supra, 428 U.S. [153] at 161-162 [96 S.Ct. 2909 at 2919-2920, 49 L.Ed.2d 859] ... The erroneous application of the statutory aggravating circumstance of `depravity of mind to the victim' ... does not invalidate the valid parts of the verdict of the jury."

*1277 Proportionality

The purpose of the proportionality inquiry is to determine "whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Supreme Court Rule 28, § 1(c).

The Crime
Ronald Monroe broke into the victim's home during the middle of the night, as she lay sleeping with her two children. He stabbed Lenora Collins to death and attempted to kill her daughter Theodise. Although Theodise's lung collapsed when Monroe stabbed her in the back, she escaped further injury by locking herself in the bathroom. Monroe threatened to kill the victim's son Joseph, but Joseph avoided injury by hiding behind an automobile. According to the evidence adduced at trial, the defendant's motive for the killing was anger because the victim's mother had decided to evict the defendant's family from their residence.

The Defendant
At the time of this offense, the defendant was twenty-two years old. He was married with a three year old child, although this fact was not brought out at his trial. He quit school after the sixth grade, and has no significant work history. He had a few run-ins with juvenile authorities, and one adult arrest for fighting.
The defense assigns as a mitigating factor in this case that defendant was mentally impaired at the time of the offense because of intoxication. There is testimony in the record by defendant and his mother that, at the time of this offense, defendant was sleeping off a drunk. However, this testimony was introduced to substantiate defendant's proffered alibi defense. There is other evidence in the record that the defendant neither appeared intoxicated nor smelled of alcohol.

Comparison With Similar Cases
The instant case is the first occasion this court has had to review the proportionality of a death sentence imposed in Orleans Parish since our laws were amended to conform to the constitutional requirements of Gregg v. Georgia, supra. Although this is the fourth Orleans Parish death case to reach this court, new trials were ordered in two cases, and the sentence reduced to life imprisonment in the third.
The first Orleans Parish death case to reach this court on appeal was Ronald Monroe's first conviction for the instant murder. The jury in the first trial found the same aggravating circumstances as did the jury in the instant prosecution. The first conviction was reversed, however, because an assistant district attorney was allowed to serve as juror. State v. Monroe, 366 So.2d 1345 (La.1978).
The second case involved the murder of two employees during an armed robbery of a fried chicken restaurant by defendant Gerald Parker and an accomplice. Parker ordered the employees into a cooler, then shot them in the head. In recommending that Parker be sentenced to death, the jury relied upon three aggravating circumstances. They found that the murders occurred during the commission of an armed robbery, that the defendant knowingly created a risk of death to more than one person, and that the offense was committed in an especially heinous manner. This court reversed the conviction, and remanded for a new trial because the jury was not properly sequestered. State v. Parker, 372 So.2d 1037 (La. 1979). In Parker's second trial, the jury found him guilty of second degree murder and he was sentenced to life imprisonment.
The third case, discussed previously in this opinion, involved the stabbing death of a woman by her former boyfriend. In that case, State v. Culberth, supra, the jury that recommended death found three aggravating circumstances: first, that the defendant created a risk of death to more than one person; second, that the defendant had a previous conviction for an unrelated murder; and third, that the offense was especially heinous. On appeal this court concluded that none of the aggravating circumstances *1278 existed, and the sentence was reduced to life imprisonment.
One case, currently before this court on appeal, State v. Mattheson, No. 80-KA-2082, involves the armed robbery of a beauty salon by Harold Mattheson and his wife. Upon entering the salon Mattheson killed the receptionist by shooting her in the head with a sawed-off shotgun. The remaining twenty-three customers and employees were either bound or forced to lie face down on the floor. During the robbery, Mattheson shot a woman in the leg as she lay prostrate on the floor. In recommending that Mattheson receive the death penalty, the jury found three aggravating circumstances: one, the murder was committed during an armed robbery; two, the offense was committed in an especially heinous manner; three, the offender knowingly created a risk to more than one person.
Another case currently before this court on appeal, State v. Marshall, No. 81-KA-0426, also occurred during an armed robbery. The victim and two friends were walking toward Canal Street after becoming lost near the Iberville Project. Joseph Marshall ran in front of them, brandishing a pistol, and demanding money. The victim was shot and killed when he disregarded Marshall's demand. The defendant, who was sixteen at the time of the offense, was sentenced to death based on the jury's finding of two aggravating circumstances: one, the offense was committed during an armed robbery; two, the offender knowingly created a risk of death to more than one person.
A case not yet appealed involves the murder of a man during an attempted armed robbery and aggravated burglary. Defendant Donald Jordan and his accomplices knocked at the door of the victim's home ostensibly to use the telephone. The victim was shot to death when he refused the men admittance. The sole aggravating circumstance found by the jury was that the offense was committed during the perpetration or attempted perpetration of an armed robbery and aggravated burglary.
There have been seventy first degree murder prosecutions in Orleans Parish since January 1, 1976.[9] Three resulted in verdicts of not guilty by reason of insanity, nine resulted in manslaughter convictions, eleven in second degree murder convictions, and forty-seven resulted in first degree murder convictions. Of these first degree murder convictions, the jury recommended life imprisonment in thirty-two cases, the jury failed to agree in eight cases, and the jury recommended death in seven cases, including Monroe's case.
After comparing Monroe's case to the other first degree murder cases from Orleans Parish, we conclude that the sentence meted out to Monroe is proportionate with sentences imposed in similar cases. Although Monroe's case is dissimilar to Parker, Mattheson, Marshall and Jordan, in that the latter involve armed robberies in which the victims were random members of society, Monroe is similar to Parker, Mattheson and Marshall in that he created a risk of death to more than one person. A review of the first degree murder convictions in Orleans Parish reveals that juries are more apt to recommend death when more than one person is endangered than when the aggravating circumstance is armed robbery.
Nor does the defendant's age make the sentence disproportionate. Joseph Marshall was sixteen at the time of his offense, six years younger than Monroe. While it is true that Marshall's juvenile record is more extensive than Monroe's criminal record, the two men are alike in that neither had *1279 previously committed crimes against the person.
Three additional Orleans Parish first degree murder cases merit discussion because of certain similarities to the instant case. In each case, the defendant was convicted of first degree murder and sentenced to life imprisonment. All three convictions are currently on appeal to this court.
In State v. Chew, No. 80-KA-2675, the defendant and his girlfriend were burglarizing the victim's home when she unexpectedly returned. The defendant choked her to death with a "choke wire" he had made. As she begged for her life, he demanded that she tell him where her money was. The Chew and Monroe cases are similar in that both involve the murder of a woman in her home during an aggravated burglary. Unlike Monroe, however, Chew's decision to murder his victim was a spontaneous one made during the burglary. Chew thought he had planned his burglary at a time when the victim would not be home. Monroe, by contrast, contemplated and planned to murder his victim in cold blood as she lay sleeping.
State v. Joseph, No. 80-KA-2787, is very similar to the Chew case. The defendant was burglarizing his former next door neighbor's house when the owner's daughter unexpectedly arrived. He decided to kill the victim when she called him a fool. Joseph received a sentence of life imprisonment when the jury was deadlocked at the sentencing deliberations.
Both Chew and Joseph involve murders committed during aggravating burglaries. In neither case did the decision to kill precede the perpetration of the burglary and in neither case was there a risk of harm to more than one person.
The third case is State v. Walker, No. 80-KA-2544. The defendant's mother lived in the same apartment building as the victim. In the middle of the night, the defendant broke into Cynthia John's apartment and killed both Cynthia and her eight year old daughter by crushing their skulls with a hammer, which, according to one state witness, he had borrowed before the murders because "there was something he had to do." When he returned the hammer to its owner he confessed the killings and said he did it because he loved the sight of blood. From evidence adduced at trial it appears that Walker, a heavy user of drugs, was mentally impaired at the time of the offense.
Factually, the Monroe and Walker cases are very similar. Both men killed neighbors during aggravated burglaries, and in each case there was present the risk of death to more than one person. Both Monroe and Walker were young at the time of the offenses, and both men at the time of their sentencing were fathers of small children. Nonetheless, Monroe received the death penalty and Walker received a sentence of life imprisonment.
It would be mere speculation for this court to evaluate why Walker received life imprisonment. It is possible that the jurors in the Walker case gave importance to the possible mental impairment resulting from drug abuse, a factor not present in the Monroe case. Additionally, the evidence of Monroe's guilt was strong and direct; by contrast, the evidence adduced against Walker consisted of testimony of friends to whom defendant had confessed.
Nonetheless, the decision of the Walker jury to afford that defendant mercy does not render Monroe's sentence excessive. Monroe perpetrated his crime in a most cold blooded fashion. Monroe's decision to kill was not a spontaneous one induced by drugs. Rather, he broke into his victim's home in the middle of the night as she lay sleeping with her two children. He mercilessly stabbed her to death and tried to kill her daughter. There is no evidence that the victim had angered Monroe by anything she had said or done; rather, Monroe sought revenge against the victim because of something the victim's mother had done. Under these circumstances, the sentence of death is neither excessive nor disproportionate.
For the foregoing reasons, the conviction and sentence are affirmed.
*1280 LEMMON, J., concurs and assigns reasons.
MARCUS, J., concurs for reasons assigned by LEMMON, J.
DENNIS, J., concurs in affirmance of the conviction and dissents from affirmance of the sentence for reasons assigned.
LEMMON, Justice, concurring.
In my opinion this murder, committed in the presence of the victim's children after breaking into their home, was committed in an especially cruel manner.
Nevertheless, even if this aggravating circumstance found by the jury does not exist, I agree that the death sentence can be affirmed on the basis of the two aggravating circumstances that are clearly supported.
The jury need only find one statutory aggravating circumstance in order to recommend the death penalty. C.Cr.P. art. 905.3. If the jury finds more than one statutory aggravating circumstance and that finding as to one is clearly supported by the record, it is not necessary to overturn the death penalty because one (or more) of the additional statutory aggravating circumstances are not supported.
In recommending the death penalty, the jury may consider all aggravating circumstances, whether or not listed in the statute, and must find the existence of at least one that is listed in the statute. The underlying circumstances of this murder were properly introduced into the record and properly considered by the jury, even if those circumstances are held as insufficient to legally qualify the murder as "especially cruel."
Finally, the Supreme Court of the United States has at least twice declined to review death penalties in cases in which one of the arguments was that only one of several aggravating circumstances found by the jury had been determined on review to be supported by the record.[1]State v. Martin, 376 So.2d 300 (La.1979), cert. denied, ___ U.S.___, 101 S.Ct. 540, 66 L.Ed.2d 297 (1980); State v. Williams, 383 So.2d 369 (La.1980), cert. denied, ___ U.S. ___, 101 S.Ct. 899, 66 L.Ed.2d 828 (1981).
DENNIS, Justice, concurring in part and dissenting in part.
I respectfully concur in the majority's affirmance of the defendant's conviction and dissent from its affirmance of his death sentence.
The majority opinion finds the evidence insufficient to support one of the statutory aggravating circumstances but, nevertheless, affirms the conviction because it "know[s] of no constitutional requirement that a death sentence be vacated whenever the jury errs in its finding of a statutory aggravating circumstance." P. 1276. I respectfully suggest that there is a well established constitutional principle applicable to this case which does require that the sentence be set aside.
On this record, if the jury believed the state's evidence, defendant's death sentence could constitutionally have rested on a finding that he was engaged in aggravated burglary, or that he knowingly created a risk of death or great bodily harm to more than one person. Since the finding of an aggravating circumstance is a necessary ground for, but does not require, the death penalty, however, it is impossible to say whether these grounds alone were the basis for the verdict. On the contrary, so far as we can tell, it is equally likely that the jury would have recommended life imprisonment if it had not thought that the defendant was guilty of killing in an especially heinous, atrocious or cruel manner.
*1281 Several United States Supreme Court decisions have clear and forceful application here. In Bachellar v. Maryland, 397 U.S. 564, 90 S.Ct. 1312, 25 L.Ed.2d 570 (1970); Street v. New York, 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969); Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957); Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931), the high court held that a criminal conviction must be reversed if the jury could have based the verdict on an unconstitutional statutory ground, even though there were other valid statutory grounds which the jury in fact may have employed. In those cases, since the defendants' convictions "may have rested on an unconstitutional ground," [emphasis added] Bachellar v. Maryland, supra, 397 U.S. at 571, 90 S.Ct. at 1316, they were set aside.
There are, of course, distinctions between our case and those decided by the high court. We deal here with a verdict of death not guilt, and a statutory ground applied unconstitutionally rather than invalid on its face. But these differences only compel the verdict's reversal more urgently. If an ordinary criminal conviction which "may have rested" on an unconstitutional ground must be set aside, we clearly must reverse a death penalty having a possible unconstitutional ground, since a greater degree of reliability is called for when the death sentence is imposed. Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973, 989 (1978). A verdict based upon evidence insufficient for a finding beyond a reasonable doubt is just as unconstitutional as one based on a facially unconstitutional statute. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
Stephens v. Zant, 631 F.2d 397 (5th Cir. 1980) is a correct application of the constitutional principle. The majority opinion misconstrues the basis of its holding. The court of appeal set aside the death penalty primarily because it was based in part on an unconstitutional statutory ground. The court pointed out that the circumstances "also made it possible for the jury to consider several prior convictions...." 631 F.2d at 406. But this latter statement is clearly secondary and not essential to its main holding based on Stromberg v. California and its progeny.
The Stromberg principle requires that the death penalty in this case be set aside also. Consistent with this principle the United States Supreme Court vacated and remanded for reconsideration in light of its decision in Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) five Georgia death cases in which other aggravating circumstances besides the one the Georgia Supreme Court applied improperly in Godfrey, supra, had also been found by the jury. See Brooks v. State, 244 Ga. 574, 261 S.E.2d 379 (1979), vacated and remanded, 446 U.S. 961, 100 S.Ct. 2937, 64 L.Ed.2d 821 (1980); Hamilton v. State, 244 Ga. 145, 259 S.E.2d 81 (1979), vacated and remanded, 446 U.S. 961, 100 S.Ct. 2936, 64 L.Ed.2d 821 (1980); Baker v. State, 243 Ga. 710, 257 S.E.2d 192, vacated and remanded, 446 U.S. 961, 100 S.Ct. 2936, 64 L.Ed.2d 820 (1980); Collins v. State, 243 Ga. 291, 253 S.E.2d 729 (1979), vacated and remanded, 446 U.S. 961, 100 S.Ct. 2936, 64 L.Ed.2d 820 (1980); Davis v. State, 242 Ga. 901, 252 S.E.2d 443 (1979), vacated and remanded 446 U.S. 961, 100 S.Ct. 2934, 64 L.Ed.2d 819 (1980).
Moreover, I do not see how it rationally may be contended that a jury which erroneously believes it has legally found three aggravating circumstances to exist will not be more apt to recommend that the defendant be sentenced to death than a jury which correctly believes that the defendant is guilty of a crime involving two aggravating circumstances. To think otherwise is to ignore the realities of a capital sentencing hearing. First, the jurors are usually told by the attorneys in opening statements about the various statutory aggravating circumstances and the importance of whether they find one to exist. Next, the focus of direct and cross-examination, evidentiary objections and arguments, will further underscore the crucial importance of their finding an aggravating circumstance. Next, the lawyers will argue at length over whether the evidence proves the existence of one or more aggravating circumstances. *1282 Finally, the trial judge in the dramatic final hour of the murder trial will further impress upon the jurors the importance of their duty of deciding whether aggravating circumstances exist. He will explain that the jury must find beyond a reasonable doubt that at least one aggravating circumstance exists before a sentence of death can be imposed. He will painstakingly read and explain to them each statutory aggravating circumstance. After all of this instruction, argument and testimony about aggravating circumstances, it is highly unrealistic and purely artificial to think that a jury which believes three aggravating circumstances exist will not be more likely to impose a death penalty than a jury which finds only two. Ordinary citizen jurors are likely to be led to the common sense conclusion that, if a defendant can be put to death for a murder involving just one aggravating circumstance, then the more aggravating circumstances found to exist the more likely it is that any mitigating circumstances are outweighed and that the death penalty is appropriate.
Finally, it should be pointed out that writ denials by the United States Supreme Court in cases in which the issue arose does not mean that the principle of Stromberg has no application in the penalty phase of a capital case. Writ denials normally carry no implication or inference on the merits of a particular proposition. United States v. Kras, 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973). A "denial of certiorari means only that, for one reason or another, which is seldom disclosed, and not infrequently for conflicting reasons that have nothing to do with the merits and certainly may have nothing to do with any view of the merits taken by a majority of the Court, there were not four members of the Court who thought the case should be heard." Brown v. Allen, 344 U.S. 443, 492, 73 S.Ct. 397, 439, 97 L.Ed. 469 (1953). It is obvious, therefore, that writ denials in cases where less than four justices voted to hear the merits cannot be viewed as impairing the principle of Stromberg.
Accordingly, I dissent from the affirmance of the death penalty in this case.
NOTES
[1] Implicit in defense counsel's argument are two assumptions which we do not decide, but accept only to enable resolution of the merits of the assignments. First, defense counsel assumes that his failure to file a motion to suppress ought not bar his objection at trial to the admissibility of the evidence. At the time of the trial, C.Cr.P. 703 provided simply that a trial judge in his discretion could allow a filing of a motion to suppress during the trial. A 1980 amendment to that article provides that failure to file a motion to suppress prevents a defendant from objecting at trial to the evidence's admissibility. 1980 La.Acts, No. 431, amending C.Cr.P. 703. Technically, the issue before this court is whether defense counsel's objection at trial can be considered a motion to suppress, and, if so, whether the trial judge abused his discretion in denying the motion.

Defendant's second assumption is that Payton v. New York, supra, is retroactive. After submission of the instant case, this court decided State v. Friddle, 396 So.2d 1242 (La.1981), in which it was held that Payton will not be applied retroactively. The arrest in this case occurred on September 10, 1977. Payton v. New York, supra, was decided April 15, 1980. Nonetheless, we assume the retroactivity of Payton in order to address the merits of defendant's Fourth Amendment claims.
[2] Testimony at trial by the victim's mother and the former owner of the house in which the victim and the defendant's family lived showed that, although the defendant's family had lived there about eight years, the victim's mother purchased the house a few days before the murder and planned to evict the defendant's family. No objections were raised during the testimony of these two witnesses. However, an objection was lodged when the state sought to introduce the eviction letter and registered mail receipt signed by the defendant on the afternoon before the murder.
[3] For a fuller discussion of nonresponsive lesser included offenses, see Assignment of Error No. 36, infra.
[4] We note that the instant case differs from State v. Williams, 392 So.2d 619 (La.1980) (on rehearing). In that case, the jurors, after deliberating three hours, inquired whether the verdict had to be unanimous. Unlike the instant case, the jurors in Williams were not informed of the effect of deadlock. Rather, the trial judge reiterated from his general charge that any jury recommendation had to be unanimous. The jurors deliberated an additional forty-five minutes, then unanimously recommended death. This court vacated the sentence because the jurors were never informed of the effect of deadlock.

Our concern in Williams was over the possibility that individual jurors might be swayed to join the majority because of their fear that lack of unanimity would require either a new sentencing hearing or a new trial on the merits. That possibility is not presented in the instant case since the jurors, prior to their recommendation, learned that the effect of jury deadlock is the automatic imposition of a sentence of life imprisonment.
[5] When our capital sentencing law was enacted, these four crimes were the only ones listed. 1976 La.Acts, No. 694, adding C.Cr.P. 905.4(a). A 1979 amendment added the crimes of aggravated arson, aggravated escape and simple robbery. 1979 La.Acts, No. 74. Since the instant crime occurred prior to the 1979 amendment, the 1976 version of the statute was in effect.
[6] Although defense counsel has cited several North Carolina cases for our consideration, they do not support appellant's position.

In State v. Cherry, 298 N.C. 86, 257 S.E.2d 551 (1979), the defendant was convicted of murder and sentenced to death. The murder occurred during an armed robbery, and the defendant was convicted of felony murder, a capital offense in North Carolina. N.C.Gen.Stat. § 14-17. The underlying armed robbery was the sole aggravating circumstance relied upon by the jury as justification for the death penalty. N.C.Gen.Stat. § 15A-2000(e)(5). The North Carolina Supreme Court vacated the sentence. The court reasoned that, since felony murder requires no premeditation, it would be unfair to allow the underlying felony to function both as the basis for the conviction and as an aggravating circumstance.
The rule of Cherry is limited to an unintentional felony murder, and is inapplicable where the murder was premeditated, as State v. Goodman, 298 N.C. 1, 257 S.E.2d 569 (1979), makes clear. Of course, in this state felony murder is not first degree murder, but is second degree murder. R.S. 14:30.1. Thus, the reasoning of Cherry is not applicable.
[7] The Florida Supreme Court has affirmed convictions based in part upon nonstatutory aggravating circumstances, Elledge v. State, 346 So.2d 998 (Fla.1977); Sawyer v. State, 313 So.2d 680 (Fla.1975), cert. denied, 428 U.S. 911, 96 S.Ct. 3226, 49 L.Ed.2d 1220 (1976), but has "left unclear the extent to which nonstatutory aggravating circumstances may be considered." Dix, Appellate Review of the Decision to Impose Death, 68 Geo.L.J. 97, 136 (1979).
[8] Defense counsel in brief has called this court's attention to the North Carolina decision of State v. Goodman, 298 N.C. 1, 257 S.E.2d 569 (1979), which he claims supports the position he advocates. On the contrary, the North Carolina Supreme Court adopted a type of harmless error rule to aid it in its determination of whether a sentence based in part on a nonexistent aggravating circumstance can be affirmed on appeal. The court did vacate the sentence in that case, but its decision to do so was based upon the "highly questionable quality and credibility of the state's primary evidence." Id. 257 S.E.2d at 587.
[9] In compliance with Supreme Court Rule 28, § 4, the Orleans Parish District Attorney has supplied this court with a memorandum of all first degree murder prosecutions occurring in that parish since January 1, 1976. Four cases have been disregarded as erroneously included in the memorandum: Joseph Jenkins, No. 156-191 "G" (sentenced in 1957); Roy Hollingsworth, No. 231-123 "J" (sentenced in 1973); Michael Williams, No. 240-853 "C" (prosecuted for second degree murder); and Peter Mercadel, No. 252-940 "C" (prosecuted for second degree murder).

Additionally, defense counsel has called to our attention the case of Joseph Marshall, discussed in the text of this opinion.
[1] The decision in Stephens v. Zant, cited in the majority opinion, is distinguishable. One of the aggravating circumstances found by the jury in that case had subsequently been held facially unconstitutional in another case, and the Fifth Circuit was concerned about the effect on the jury of the presence for consideration of an unconstitutionally vague statutory circumstance. The court particularly noted that the fact of defendant's several prior convictions would not have been revealed to the jury except as evidence of the aggravating circumstance.