422 So.2d 109 (1982)
STATE of Louisiana
v.
Johnny TAYLOR, Jr.
No. 81-KA-2298.
Supreme Court of Louisiana.
October 18, 1982.
Concurring Opinion November 9, 1982.
Rehearing Denied November 19, 1982.
*111 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., John M. Mamoulides, Dist. Atty., Abbott J. Reeves, Art Lententi, William C. Credo, Asst. Dist. Attys., for plaintiff-appellee.
Maurice S. Bell, Montgomery, Ala., James Manning, Metairie, for defendant-appellant.
DIXON, Chief Justice.
Defendant, Johnny Taylor, Jr., was indicted for first degree murder (R.S. 14:30). After a jury trial, he was found guilty as charged. The jury unanimously recommended the death penalty finding two aggravating circumstances: (1) the accused was engaged in the perpetration or attempted perpetration of armed robbery at the time he killed the victim; (2) the offense was committed in an especially heinous, atrocious or cruel manner. C.Cr.P. 905.4(a), (g).
On February 8, 1980 the victim, David Vogler, received a telephone call around 8:45 p.m. from a black male about an automobile which Vogler had placed for sale in the parking lot of Barker's in Kenner, Louisiana. Vogler left his home in his Cadillac to show the red 1976 Buick Regal to the inquirer. He was not seen alive again by Mrs. Vogler. Around 12:45 a.m. Mrs. Vogler went to the parking lot in search of her husband along with her sister and her sister's boyfriend. The red Buick was missing; the Cadillac was parked in the lot. Mrs. Vogler looked in the Cadillac window and saw her husband's coat on the front *112 seat. She saw two police cars stopped in the lot and asked the officers if they had seen the Buick. They assured her that they would be on the look out for it. Mrs. Vogler then returned to her mother's house where she spent the night. At 9:00 o'clock the next morning she returned to the parking lot with her brother-in-law, Larry Huesman. Huesman looked inside the Cadillac and saw blood on the upholstery. Fearing foul play, Huesman dropped Mrs. Vogler off and called the police. He met Officer Averett back at the parking lot and gave the officer Mrs. Vogler's extra set of keys. When Officer Averett opened the trunk, he saw the body of David Vogler. An autopsy revealed that David Vogler died from multiple stab wounds.
Detectives William Fayard and Nick Congemi of the Kenner Police Department conducted an investigation. Customers and employees of the nearby businesses were interviewed with no success. Due to the rainy weather on the night of February 8 and the morning of the 9th, the car was towed to a security garage to dry out. On February 10 technician Joseph Deidrich dusted the car for latent fingerprints. Black hairs were recovered from the ceiling of the automobile, the sun visors and the inside trunk ledge. Deidrich also vacuumed the vehicle to collect debris.
On June 14, 1980 Chief Jimmy Acton stopped the accused in Millry, Alabama for a traffic violation. He was driving the Buick Regal. His cousin, Samuel Young, and his girl friend, Linda Pugh, were with him. A check on the automobile indicated that it was stolen and that the occupants might have been involved in a murder in Kenner, Louisiana. Defendant fled from the officer under the pretext of needing to urinate; his companions were arrested for possession of a stolen vehicle. On June 15, 1980 Detectives Fayard and Congemi drove to Millry and interviewed Young and Pugh. They compared the "vin" number on the automobile to the number of the vehicle registration form to determine that this vehicle was the one stolen from the Voglers. The detectives opened the trunk and found receipts dated March 16, 1980 and May 3, 1980 bearing the name "James Taylor" for body work done on the Buick at Terry's Body Shop. Congemi and Fayard drove to Pritchard, Alabama and questioned Terry Webb, the owner of the repair garage. Webb gave them his copy of an estimate sheet dated February 9, 1980 which itemized repairs to be done to the car and a paint job requested by defendant.[1] The Buick was driven back to Kenner, Louisiana.
Defendant was subsequently arrested on June 17, 1980 for an unrelated auto theft and incarcerated in Butler, Alabama. Detectives Fayard and Congemi drove to Butler on June 18 to question Taylor. Two statements were given by Taylor; neither statement satisfactorily explained how the accused came into possession of the Buick Regal. Eddie Slayton of the Alabama Bureau of Investigation took defendant's finger and palm prints and gave them to Detective Fayard. These prints, along with those taken from the Cadillac, were sent to the FBI by registered mail on June 23, 1980. Ronald Young, a latent fingerprint specialist with the FBI, compared the two sets of prints and concluded that Taylor's left palm print matched the partial palm print from the outside trunk lid based on forty points of identification. Samples of head hair taken from defendant during the interview showed similar characteristics to the hairs found in the Cadillac.
A warrant for defendant's arrest was executed on June 17, 1980. A copy of the warrant was given to the authorities in Alabama. Taylor was indicted on August *113 28, 1980 and subsequently extradited to Louisiana.

Assignment of Error No. 1
Defendant urges that the trial court erred in denying his writ of habeas corpus on the ground that he was unconstitutionally transferred from Alabama to Louisiana without a pre-transfer hearing, without being advised of the nature of the offense for which he was indicted and without the benefit of counsel. See U.S. Const.amend. VI; Ala.R.S. 15-9-38; C.Cr.P. 267.
Taylor was arrested on an unrelated auto theft charge and incarcerated in Butler, Alabama. On June 17, 1980 an arrest warrant was issued in Jefferson Parish for second degree murder, armed robbery and theft. He was indicted for first degree murder on August 28, 1980; on October 23, 1980 a copy of the indictment, minute entry, arrest warrant and commitment for Taylor were sent to the Alabama authorities. On November 7, 1980 a formal request was made to the Governor of Alabama to extradite defendant to Louisiana to stand trial for murder. Taylor was surrendered on November 26, 1980.
An illegal arrest or detention does not void a subsequent conviction. Frisbie v. Collins, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952). Although a detained suspect may challenge his confinement for probable cause, a conviction will not be vacated on the ground that the accused was detained pending trial without a determination of probable cause. Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975).
The case relied upon by the defense, Cuyler v. Adams, 449 U.S. 433, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981), is inapposite. In Cuyler, the defendant had been convicted and was imprisoned in Pennsylvania. New Jersey sought to extradite the defendant for trial on charges there. The accused was extradited, tried, convicted and sentenced. There had been no pre-transfer hearing as required by the Uniform Extradition Act. Defendant sought declaratory, injunctive and monetary relief under 42 U.S.C. §§ 1981 and 1983. The court held that the defendant had stated a claim upon which relief could be granted. There was no suggestion that the New Jersey conviction was invalid because of any irregularities in the extradition process.
This argument is without merit.

Assignments of Error Nos. 2 and 4
Defendant argues that he was denied a fair trial because the state destroyed or lost evidence favorable to him in contravention of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, he contends that the state improperly discarded two prints lifted from the seat belt guards and "lost" an additional print.
The state counters that routine police procedure was followed in handling the prints from the Cadillac. Further, since Taylor's left palm print matched the palm print taken from the outside trunk lid, it is irrelevant whether or not additional prints existed because defendant's presence at the trunk of the Cadillac is established.
The suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to either guilt or punishment. Brady v. Maryland, supra. The test for materiality is whether the suppressed evidence creates a reasonable doubt that does not otherwise exist. United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); State v. Hicks, 395 So.2d 790 (La.1981); State v. Falkins, 356 So.2d 415 (La.1978), cert. denied 439 U.S. 865, 99 S.Ct. 190, 58 L.Ed.2d 175 (1978).
Technician Deidrich lifted one partial palm print from the outside trunk lid, one partial palm print from the inside trunk lid, two fingerprints from the seat belt guards, and four fingerprints from an inside passenger window; a total of eight prints. These notations are found on the outside of a small white envelope dated "2-10-80," *114 bearing item number B-4602-80.[2] Fingerprint technician Larry Rolfes testified that he examined the "lifts" made by Deidrich.[3] He determined that three of the prints were good and these prints were preserved; four remaining prints did not contain enough points for identification. Rolfes discarded the two prints taken from the seat belt guards which were on one lift. When asked on cross-examination about the seeming disappearance of one print, Rolfes explained that occasionally a technician may not be able to read what he is lifting and a mistake is made in his count. In any event, Rolfes testified that he examined all four lifts (which supposedly had eight prints according to Deidrich's computations) and threw away one lift containing two prints from the seat belt guards, leaving three lifts. Thus, no prints were inadvertently lost.
The officers testified that the standard procedure is for prints to be placed in an envelope and secured in a locker pending pickup by the fingerprint technician. Generally, all evidence is turned over to the evidence custodian who logs it and keeps track of it on a chain of custody form. However, fingerprints are directed to the fingerprint technician so that they can be analyzed. If only smudges are visible, the technician on the scene does not attempt to lift a print. If lines are present, a lift will be made. The fingerprint specialist retrieves the prints from the locker and examines them to determine whether sufficient points exist to make an identification. If so, the prints are retained until a suspect develops. If not, the useless prints are discarded.
No Brady violation has been shown by defendant. All pertinent prints were turned over to the defense, including those that did not match defendant's prints. The fingerprint technician merely threw away prints which were of no value, either as exculpatory or inculpatory evidence, because they contained insufficient points for identification purposes. Standard procedure was followed. Although Deidrich stated that he secured the prints in his locker to be picked up by the evidence custodian, Don Carson, Rolfes testified that he received the prints from Deidrich according to routine practices.[4]

*115 In order to introduce demonstrative evidence, it suffices if the foundation laid establishes that it is more probable than not that the object is the one connected with the case; lack of positive identification or a defect in the chain of custody goes to the weight of the evidence rather than to its admissibility. State v. Sam, 412 So.2d 1082 (La.1982); State v. Davis, 411 So.2d 434 (La.1982); State v. Provost, 352 So.2d 661 (La.1977). A proper foundation was laid by the prosecution for admission of the prints. The jury was aware of the defense's intimation that a print had been lost and that only one of the three good prints matched the prints taken of defendant; it was for the jury to assess the weight to be given to this evidence.
These assignments lack merit.
Assignments Neither Briefed Nor Argued
Because this is a capital case, this court will review those assignments of error which are neither briefed nor argued. State v. Monroe, 397 So.2d 1258 (La.1981); State v. Jones, 332 So.2d 466 (La.1976).

Assignment of Error No. 3
Defendant complains that the trial court erred in permitting the introduction of his statements made to detectives Fayard and Congemi in Alabama on the ground that they were made against his will and without benefit of counsel.
On June 18, 1980 detectives Fayard and Congemi questioned Taylor at the Choctaw County Sheriff's Office. After advising defendant of his rights, the officers took a written statement in which Taylor said he bought the Buick from "two white dudes" on March 8, 1980. Midway through this statement, Detective Congemi told Taylor that they did not think he had been honest. The estimate from Terry's Body Shop dated February 9, 1980 with Taylor's name on it was shown to Taylor. Taylor acknowledged that he had lied in the first statement and agreed to give another statement.
Before the second statement was begun, Taylor was given his rights a second time and an oral statement taken. In this statement, Taylor said the Buick was brought to his house sometime in March by one Allen Thomas. This interview was halted by the detectives because they thought Taylor was not telling the truth.
Defendant testified that the officers advised him of his rights and he replied that he understood them. However, he stated that he requested an attorney but was not provided one. According to Taylor, the detectives showed him photographs of the deceased lying in the trunk of an automobile and told him that eyewitnesses saw Taylor in the parking lot. Defendant admitted at trial that he did not tell the truth in the first statement; his version of how he obtained the Buick paralleled the second statement. Taylor admitted fleeing after being stopped on his way back to Butler; he explained that he left because he was on probation and would "get more time" for driving a stolen vehicle. Taylor also admitted going to Webb's shop on February 9, 1980. He asked that the Buick be painted a dark gray because he had been involved in a hit and run accident and did not want anyone to recognize the automobile.
The detectives testified that Taylor was informed of his rights before each statement, and that Taylor said he fully understood them. Detective Congemi testified that Taylor did not request an attorney. They did not threaten or coerce defendant in any way. There is some discrepancy between the officers' recollections of whether defendant was shown any photographs. Detective Fayard testified that he showed defendant a picture of Vogler alive with his family; he did not show defendant any pictures of Vogler deceased. Detective Congemi, however, testified that no pictures whatsoever were shown to defendant; the only item shown him ws the estimate from the body shop.
*116 Before a confession or inculpatory statement can be introduced into evidence, the state has the burden of affirmatively proving that it was made freely and voluntarily and not made under the influence of fear, duress, intimidation, menaces, threats, promises or inducements. State v. Petterway, 403 So.2d 1157 (La.1981); State v. Martin, 400 So.2d 1063 (La.1981). It is also necessary that the state establish that the defendant who makes an inculpatory statement during a custodial interrogation has been informed of his "Miranda" rights. State v. Martin, supra; Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The admissibility of a confession or statement is a question for the presiding judge. His conclusions on the credibility and weight of a confession will not be overturned unless they are unsupported by the evidence. State v. Carter, 412 So.2d 540 (La.1982); State v. Campuzano, 404 So.2d 1217 (La.1981); State v. Martin, supra.
The record indicates that defendant was fully advised of his rights and that he comprehended them. There is no evidence of coercion or inducement. Further, the statements made by Taylor were not truly inculpatory; each statement offered an explanation of how Taylor came to be in possession of the Buick. The statements did not place defendant at the scene nor did Taylor confess involvement in the crimes committed in Kenner. The main inculpatory aspect of the statements was their obvious falsity.
This assignment lacks merit.

Assignment of Error No. 5
Defendant contends that the trial court erred in allowing the introduction of palm and finger prints taken from him while he was incarcerated in Alabama, without benefit of counsel, on the ground that it amounts to self-incrimination.
This argument is without merit. The privilege against self-incrimination extends to evidence of a testimonial or communicative nature; it is not violated by the gathering of physical evidence from the accused. Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); State v. Carthan, 377 So.2d 308 (La.1979). The prints, of course, (and hair samples) were taken with defendant's consent.
For these reasons, the conviction should be affirmed.[5]
MARCUS, Justice.
SENTENCE REVIEW
Article 1, section 20 of the Louisiana Constitution prohibits cruel, excessive, or unusual punishment. La.Code Crim.P. art. 905.9 provides that this court shall review every sentence of death to determine if it is excessive. The criteria for review are established in La.Sup.Ct.R. 28, § 1, which provides:
Review Guidelines. Every sentence of death shall be reviewed by this court to determine if it is excessive. In determining whether the sentence is excessive the court shall determine:
(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

(a) Passion, prejudice or any other arbitrary factors
There is no evidence that passion, prejudice or any other arbitrary factors influenced the jury in its recommendation of the death sentence. Nor has any argument to that effect been raised by defendant.
*117 (b) Statutory aggravating circumstances
The jury found that two of the aggravating circumstances listed in La.Code Crim.P. art. 905.4 were present in this case:
(a) the offender was engaged in the perpetration of ... armed robbery, ...
(g) the offense was committed in an especially heinous, atrocious, or cruel manner;...
The record amply supports the jury's conclusion that the murder was committed while defendant was engaged in the perpetration of an armed robbery. La.R.S. 14:64. Armed robbery is the theft of anything of value from the person of another or which is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon. In response to a telephone inquiry, the victim, David Vogler, traveled in his Cadillac to a parking lot where he had placed his old Buick Regal with a "For Sale" sign and his phone number. When Vogler did not return home within a few hours, family members went to the parking lot and observed that while the car he had driven to the lot was still there, the Buick Regal was gone. The next morning, Vogler was found dead, stuffed in the trunk of the car he had driven to the parking lot. An autopsy showed that he had been stabbed over twenty times by a sharp knife at least three inches long. Defendant's left palm print matched the partial palm print lifted from the outside trunk lid of the Cadillac based on forty points of identification. Samples of hair taken from defendant showed similar characteristics to the hairs found in the Cadillac. A repair estimate dated the day after the murder showed that defendant was in possession of the Buick Regal the morning following the murder. Defendant admitted that he acquired the automobile within hours of Vogler's death. The evidence clearly supports the finding that the murder was committed by defendant while robbing the victim of his automobile.
The jury also found that the first degree murder of David Vogler was committed in an especially heinous, atrocious or cruel manner. La.Code Crim.P. art. 905.4(g). We have previously construed this statutory aggravating circumstance as incorporating some idea of "torture or pitiless infliction of unnecessary pain on the victim." State v. Sonnier, 379 So.2d 1336 (La. 1979) (on original hearing); State v. English, 367 So.2d 815 (La.1979). To find that the murder was committed in an especially heinous manner, there must be evidence of serious physical abuse of the victim before death. The murder must be one that "causes death in a particularly painful and inhuman manner." State v. Baldwin, 388 So.2d 664 (La.1980). In Baldwin, we held that there could be "no question that a prolonged beating" of an elderly woman left to die a lingering death is "an especially cruel way to commit murder." In State v. Moore, 414 So.2d 340 (La.1982), where a twenty-year-old woman was raped and robbed and then stabbed thirteen times, seven of which were potentially fatal, this court held:
Because of the number of wounds inflicted and the fact that [the victim] died slowly with awareness of her impending death, the jury could reasonably have found that the offense was committed in an especially heinous, atrocious and cruel manner.
We have also held a murder to be especially heinous where the defendant chose to stab his victim some thirty to thirty-five times in the back, neck, head, arms, and hands. State v. Clark, 387 So.2d 1124 (La.1980).
In the instant case, defendant enticed David Vogler out of the security of his home, late on a cold night, to an empty parking lot to rob him of his keys and the automobile he had left on the lot for sale. Vogler was found the next morning, stuffed into the trunk of the car he had driven to the parking lot, barechested with his sweater pulled down to his wrists. He had suffered over twenty stab wounds, small puncture wounds, and superficial cuts and scratches to his arms, stomach, chest, neck and temples. The coroner found that almost all of these wounds had been created by a small but sharp knife at least three *118 inches long. The majority of the wounds were pricks or shallow punctures, opening the skin and going through soft tissue, but not deep enough to cause major damage to internal organs. There were fourteen such shallow punctures into the soft tissue of the stomach alone. A few deep stabs completely punctured the victim's liver, punctured his diaphragm twice causing collapse of the lower left lung, and severed the vagus nerve trunk of his left side. The coroner noted that "a person with a cut to that nerve would tend to experience a feeling of palpitation with an increased rate of heart beat, probably nausea and a sort of suffocating feeling...." In the coroner's opinion, Vogler "probably died in the [car] trunk.... [His injuries were not] of the kind that ... in lay terms would be regarded as instantaneous or fatal [but] as if the kind of death that is going to take place over a period of minutes due to the collapse of the lungs and the blood leaks from the blood vessels.... [D]eath would occur probably within 10-20 minutes from the time of the infliction of the injury." Obviously Vogler suffered serious physical abuse before being left to die in the trunk of his car. Death did not occur for ten to twenty minutes. Clearly, the murder caused death in a "particularly painful and inhuman manner." Under the circumstances, we consider that the evidence fully supports the jury's finding that the offense was committed in an especially heinous, atrocious, or cruel manner.

(c) Proportionality to the penalty imposed in similar cases
Supreme Court Rule 28, § 4 provides that the district attorney shall file with this court a list of each first degree murder case in the district in which sentence was imposed after January 1, 1976. The list shall include the docket number, caption, crime convicted, sentence actually imposed and a synopsis of the facts in the record concerning the crime and the defendant.
In the instant case, the list reveals that there have been twenty-one first degree murder prosecutions in the Twenty-Fourth Judicial District Court in and for the Parish of Jefferson since January 1, 1976. Of these prosecutions, fifteen, including the instant case, resulted in verdicts of first degree murder.[6] Out of these fifteen, the death penalty was recommended by the jury in five cases, including the present case.[7] In all five of these cases the defendants were the actual killers. In this case and two others, the killings occurred during armed robberies, a statutory aggravating circumstance, and at least one other aggravating circumstance was found by the jury.[8] In the fourth and fifth death cases, there was either a risk of death or great bodily harm to more than one person or multiple aggravating circumstances.[9]
*119 In the ten remaining first degree murder verdicts in Jefferson Parish, where a death sentence was not imposed, there was only one aggravating circumstance or a complete absence of such circumstances, or there were present mitigating circumstances which justified the jury's recommendation of life imprisonment.[10] One case draws our attention, State v. Shilling, No. 82-KA-1820 (docketed but not yet set for argument). There, defendant and another man brutally beat and stabbed their victim, took $30 out of his pants pocket, and then slit his throat and drowned him. Only a life sentence was recommended. However, we are not bound to reverse every death sentence from Jefferson Parish that comes before us for review in the future just because in one case the jury spared the defendant's life. Proportionality is a safeguard against arbitrary and capricious action by a jury. We do not find that the jury in the instant case acted arbitrarily in comparison with juries in similar cases when it recommended the death sentence.
According to the Capital Sentence Report, defendant is a twenty-nine year old black male, one of eight children whose parents are divorced. He is separated from his wife, although he sometimes lives at her house. The rest of the time he lives with his mother. He has three children from his marriage; he contributes child support irregularly, mostly around the holiday season. He is also the father of three illegitimate children to whom he does not contribute support. Taylor's employment record is sporadic. He was unemployed at the time of the instant crime. He served in the military, but in 1977 was given an undesirable discharge because of an accusation of larceny. In 1979, he was convicted of grand larceny, and he has pending in Alabama charges for receiving stolen property and robbery. Prior to his return to Louisiana, he was apprehended in Alabama when he swerved and just missed a police car. He was driving without a license. There were both beer and marijuana in his car and two .12 gauge shotguns, one of which was in the trunk. Taylor escaped and made his way to Mississippi where he was apprehended in another stolen automobile. This arrest led to his return to Louisiana to stand trial on the instant charge.
After considering both the crime and the defendant, we are unable to conclude that the sentence of death in the instant case is disproportionate to the penalty imposed in similar cases in Jefferson Parish.
In sum, based on the above criteria, we do not consider that defendant's sentence of death constitutes cruel, excessive or unusual punishment.
For these reasons, the sentence should be affirmed.

DECREE
For the reasons assigned, defendant's conviction and sentence are affirmed.
DIXON, C.J., dissents with reasons from the sentence review portion of the opinion.
LEMMON, J., assigns additional concurring reasons.
*120 DIXON, Chief Justice (dissenting from the sentence review of the majority).
I respectfully dissent from the sentence review of the majority.
The jury found that the instant offense was committed in an "especially heinous, atrocious or cruel manner." In order for a murder to be "especially heinous," there must exist evidence that there was "torture or the pitiless infliction of unnecessary pain on the victim." State v. Sonnier, 402 So.2d 650 (La.1981); State v. Monroe, 397 So.2d 1258 (La.1981); State v. English, 367 So.2d 815 (La.1979); State v. Clark, 387 So.2d 1124 (La.1980), cert. denied 449 U.S. 1103, 101 S.Ct. 900, 66 L.Ed.2d 830 (1981). Where the wounds were inflicted to kill, not to maim or to inflict pain, the manner in which the offense was committed cannot be termed "especially heinous." See State v. Culberth, 390 So.2d 847 (La.1980). It is evident that the murder was brutalthe victim was stabbed twenty times and left in the trunk to die. The physician who performed the autopsy on the victim testified that death was not instantaneous; the victim could have lived for ten to twenty minutes after infliction of the wounds.
In State v. Clark, supra, the victim was stabbed with a butcher knife some thirty to thirty-five times and then shot once. This court concluded that substantial evidence supported the jury's finding that the offense was committed in an especially heinous manner in light of the fact that the defendant could have killed the victim with the gun, yet chose to stab him repeatedly before the shooting.
In State v. Moore, 414 So.2d 340 (La. 1982), the victim suffered thirteen stab wounds, seven of them potentially fatal. This court upheld the jury's finding that the offense was perpetrated in an especially heinous manner because of the number of wounds inflicted and the slow death endured by the victim.
This case parallels State v. Monroe, supra. In that case, the defendant broke into the victim's house and stabbed her seven times; three of the wounds caused the death. The victim lost over two quarts of blood, her lungs were punctured and one of her ribs was severed. Her death was also not instantaneous; she lived long enough to call out for her daughter and to reach for the telephone. This court held that, although the murder was brutal, it was not proved beyond a reasonable doubt that the offense was especially heinous.
A murder like this one and the one in State v. Monroe, supra, or State v. Culberth, supra, is surely hatefully or shockingly evil (heinous). But before the act of killing can be used as one of the "aggravating circumstances" which will justify the death penalty (C.Cr.P. 905.4), it must be committed in an especially heinous, especially atrocious or especially cruel manner.
In the present case, the state failed to prove beyond a reasonable doubt that the offense was committed in an especially heinous manner. Due perhaps to the relatively short blade, several of the wounds were superficial and not fatal. There was no showing that the wounds were inflicted to maim or to torture the victim; rather, all of the evidence leads to the conclusion that the killer's efforts were designed simply to kill.

Proportionality of Sentence
Under Supreme Court Rule 28, § 1(c), this court must determine "whether the sentence imposed is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."
The sentence imposed in this case is disproportionate with sentences in other similar cases.
The Death Sentence Proportionality Analysis submitted to this court by the Jefferson Parish District Attorney's Office shows that there have been twenty-one first degree murder prosecutions in Jefferson Parish since January 1, 1976. Of these prosecutions, fifteen resulted in convictions of first degree murder, four ended in convictions of second degree murder and two culminated in verdicts of manslaughter. Out of the fifteen first degree murder convictions, the death penalty was recommended by the jury in five cases.
*121 In another death case presently pending before this court, State v. Sawyer, 442 So.2d 95 (La.1982), the jury found three aggravating circumstances: the defendant was engaged in the perpetration of an aggravated arson, the defendant had been convicted of an unrelated murder, and the offense was committed in an especially heinous manner. The evidence revealed that the victim had been badly beaten, burned and mutilated.
In State v. Berry, 391 So.2d 406 (La.1980), the defendant shot a security guard during the armed robbery of a bank. The jury sentenced the defendant to death finding three aggravating circumstances: the defendant was engaged in the perpetration of an armed robbery, the victim was a policeman and the defendant created a risk of death or great bodily harm to more than one person.
The death sentence was also recommended in State v. Lindsey, 404 So.2d 466 (La.1981), after the jury found that the defendant created a risk of death or great bodily harm to more than one person. The facts surrounding the offense indicated that the defendant was involved in an armed robbery at the time of the shooting. This court reversed the death sentence due to specific references to the possibility of a pardon or commutation by both the prosecutor and the trial court.
Finally, in State v. Smith, 400 So.2d 587 (La.1981), the defendant was sentenced to death upon the finding that he created a risk of death or great bodily harm to more than one person by randomly shooting at a group of youths. This court remanded the case for development of additional facts regarding the existence of the aggravating circumstances.
In the remaining first degree murder convictions, a sentence of life imprisonment was imposed. A companion case to State v. Sawyer, supra, resulted in the conviction of Charles Lane; a life sentence was imposed.
In State v. Wilson and Moses, 404 So.2d 968 (La.1981), defendants fired a gun into a crowd of people, killing the victim. Life imprisonment was recommended.
In State v. Sharp, 418 So.2d 1344 (La. 1982), defendant stabbed two persons to death during a domestic dispute. Once again, a life sentence was imposed.
In State v. Tuckson, 414 So.2d 360 (La. 1982), a life sentence was recommended where defendant shot the victim under circumstances suggesting a burglary of the victim's truck.
A life sentence was also recommended in State v. Goza, 408 So.2d 1349 (La.1982). In that case, the state maintained that defendant procured someone to kill her husband. Defendant argued that her husband was killed as the result of an armed robbery. Both the conviction and sentence were reversed on appeal.
In State v. Shilling, No. 82-KA-1820, an eyewitness testified that the defendant brutally beat and stabbed the victim under facts indicating a robbery. Life imprisonment was imposed.
In State v. Love, 410 So.2d 1045 (La. 1982), the evidence indicated that the defendant shot the victim in the head during an armed robbery. This court reversed the jury's recommendation of life imprisonment, finding that no aggravating circumstances had been proved beyond a reasonable doubt (under the old statutory scheme).
In State v. Riggins, 388 So.2d 1164 (La. 1980), the defendant shot the victim, a sixty-eight year old shopkeeper, four times during an apparent armed robbery. Life imprisonment was recommended.
In State v. Andrews, 369 So.2d 1049 (La. 1979), the defendant stabbed the victim to death during a heated argument. The offender and the victim were competitors in a sandlot football game. A life sentence was received.
In State v. Manieri, 378 So.2d 931 (La. 1979), the defendant strangled and stabbed the victim, an eleven year old boy, thirty times. Upon completion of the murder, defendant and his brother made the scene appear as though a burglary had occurred. A life sentence was imposed.
*122 A review of these first degree murder convictions indicates that juries in Jefferson Parish have imposed the death penalty where the defendant knowingly created a risk of death or great bodily harm to more than one person or where a combination of aggravating circumstances existed. However, juries have not recommended the death sentence where the sole aggravating circumstance was that the defendant was engaged in the perpetration of armed robbery. On the facts, the instant case most closely resembles State v. Manieri, supra, and State v. Shilling, supra. In both of these cases, a sentence of life imprisonment was imposed. This court ought to conclude that the death sentence imposed in this case is disproportionate to the sentence imposed in similar cases in Jefferson Parish, and vacate the sentence.
LEMMON, Justice, concurring.
I subscribe to and have signed the opinion of the court, but submit this concurring opinion to point out that the significance of the "especially heinous, atrocious or cruel" statutory aggravating circumstance has decreased considerably since the present capital sentencing law was first enacted in 1976.
In Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the Court approved the use of statutory aggravating circumstances as a method of channeling the jury's discretion in deciding which murderers should be subject to the death penalty and which should not. And in Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), the Court also approved a method of channeling jury discretion whereby the use of aggravating circumstances in the definition of the essential elements of first degree murder serves the same purpose of narrowing the class of murderers who are "death eligible".
After the Gregg and Jurek decisions, the Louisiana Legislature in 1976 enacted a new capital sentencing procedure patterned after the one approved in Gregg v. Georgia.[1] Between 1976 and 1979 (except for the "Payton period")[2], the use of the "especially heinous, atrocious or cruel" aggravating circumstance in the penalty phase of the trial was particularly important, because a jury could consider a death sentence when there was a specific intent killing and any one of the statutory aggravating circumstances listed in C.Cr.P. Art. 905.4. There was significant jurisprudence during that period concerning the "especially heinous, atrocious or cruel" aggravating circumstance.[3]
In 1979 the Legislature amended R.S. 14:30, which now defines first degree murder to require proof of one of four enumerated circumstances as an essential element of the crime. (These four "aggravating elements" are also among the statutory aggravating circumstances listed in C.Cr.P. Art. 905.4.) Under present law, a murder committed in an "especially heinous, atrocious or cruel" manner, without further proof of an "aggravating element" of first degree murder enumerated in R.S. 14:30, would be second degree murder.[4] The class of "death eligible" murderers in Louisiana is now narrowed in the guilt phase, rather than in the penalty phase, as was done in Gregg and under the previous Louisiana *123 law.[5] In effect, Louisiana now has a hybrid procedure somewhere between the Georgia procedure approved in Gregg and the Texas procedure approved in Jurek. The significance of this apparently unplanned legislative development is that the murderers who are not "death eligible" because of the lack of "aggravating elements" are now eliminated during the guilt phase of the bifurcated trial and are not even exposed to a penalty hearing. And those murderers who are "death eligible" under present law may still present proof of mitigating circumstances to the jury during the penalty phase. However, proof in the penalty phase of additional aggravating circumstances not listed in R.S. 14:30 (such as the "especially heinous, atrocious and cruel" aggravating circumstance) is now not as pertinent to the determination of which murders and murderers are "death eligible" as it is to the determination of whether this particular murderer should be sentenced to death for this particular murder. See State v. Sawyer, 442 So. 2d 95 (La.1982), decided this day.
Finally, it is important to note that the evidence offered in the present case to prove the "especially heinous, atrocious or cruel" statutory aggravating circumstance was admissible under the applicable "rules of evidence". C.Cr.P. Art. 905.2 and 905.4. Therefore, defendant was not prejudiced by the introduction of the evidence, whether or not the jury returned a finding of this particular aggravating circumstance and whether or not the evidence supported the finding in that regard.[6] Nevertheless, I agree that the statutory aggravating circumstance was supported in this case.[7]
NOTES
[1] At trial, Terry Webb positively identified defendant as the individual to whom he spoke on February 9, 1980 concerning repair work on the Buick Regal.
[2] The front of the envelope reads as follows:
[3] A "lift" is a piece of plastic on which the prints are placed to preserve them.
[4] The defense also challenges Deidrich's testimony on cross-examination arguing that Deidrich failed to recognize prints he was supposed to have lifted. A close reading of this testimony indicates, however, that defense counsel was questioning Deidrich about photographs taken of the lifts and not the lifts themselves. The state does not suggest that these photographs, made for the purpose of comparison by the FBI to Taylor's prints, were taken by Deidrich. It follows that he would not recognize the handwriting or printing on them.
[5] Dixon, C.J. is in the minority on the sentence review portion of this review. See the dissent which follows.
[6] State v. Shilling, No. 82-KA-1820 (docketed but not yet set for argument); State v. Sawyer, 442 So.2d 95 (La.1982); State v. Sharp, 418 So.2d 1344 (La.1982); State v. Lane, 414 So.2d 1223 (La.1982) (a companion to Sawyer); State v. Tuckson, 414 So.2d 360 (La. 1982); State v. Love, 410 So.2d 1045 (La. 1982); State v. Goza, 408 So.2d 1349 (La. 1982); State v. Wilson and Moses, 404 So.2d 968 (La.1981); State v. Lindsey, 404 So.2d 466 (La.1981); State v. Smith, 400 So.2d 587 (La.1981); State v. Berry, 391 So.2d 406 (La.1980); State v. Riggins, 388 So.2d 1164 (La.1980); State v. Manieri, 378 So.2d 931 (La. 1979); State v. Andrews, 369 So.2d 1049 (La. 1979).
[7] The other four cases were Sawyer, supra; Smith, supra; Berry, supra, and Lindsey, supra.
[8] The two cases involving armed robberies, in addition to the instant case, were Berry and Lindsey, supra. In Berry, a police officer was killed during the course of an armed robbery. In Lindsey, the defendant committed, or attempted to commit, armed robbery of a woman in a shopping mall parking lot, then shot her in the back, and threatened the lives of those who pursued him. The conviction was affirmed in Lindsey but the sentence was vacated and the case remanded for a new sentencing hearing because of references by the prosecutor and the trial judge to the possibility of a pardon and commutation during the sentencing hearing.
[9] The two other death cases were Sawyer and Smith, supra. In Sawyer, there were multiple aggravating circumstances. In Smith, there was a risk of death or great bodily harm to more than one person. The conviction was affirmed in Smith but the case was remanded to the trial judge for development of additional facts relating to the existence of the aggravating circumstance found by the jury.
[10] State v. Lane, supra (Defendant was not the actual killer.); State v. Sharp, supra (Intoxicated Vietnam veteran killed wife's relatives when they tried to force him to leave their house in which his wife was staying since she decided to seek divorce.); State v. Goza, supra (Defendant was not the actual killer. The conviction and sentence were reversed and the case remanded for further proceedings.); State v. Andrews, supra (Defendant and victim were teenagers who had been arguing over football game.); State v. Manieri, supra (Defendants, two brothers ages 17 and 21, went to an acquaintance's house looking for marijuana; they killed eleven-year-old son of woman who asked them to leave her house.); State v. Love, supra (No aggravating circumstances established. The conviction and sentence were reversed and the case remanded for retrial.); State v. Tuckson, supra (On review, this court set aside the conviction and remanded the case for entry of guilty of second degree murder. Entry of unoccupied vehicle was not aggravated burglary.); State v. Wilson and Moses, supra (Defendants, both black, got into confrontation with a group of eighteen white males who were drinking beer in shopping center parking lot; defendants fired several shots, fatally wounding one person. The convictions and sentences were reversed and the case was remanded for a new trial.); State v. Riggins, supra (Defendant shot an elderly man who was in the process of closing up his business.); State v. Shilling, supra (Defendant and co-defendant stabbed and beat victim, took $30 from his pants pocket, and later slit his throat and drowned him.).
[1] Louisiana's former capital sentencing procedure was declared unconstitutional in Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976).
[2] See State v. Payton, 361 So.2d 866 (La. 1978), in which this court held that the 1977 amendment to second degree murder "impliedly amended" the first degree murder statute to require the prosecution to prove an "aggravating circumstance" as an element of first degree murder.
[3] See State v. English, 367 So.2d 815 (La. 1979); State v. Clark, 387 So.2d 1124 (La.1980), cert. denied, 449 U.S. 1103, 101 S.Ct. 900, 66 L.Ed.2d 830; State v. Culberth, above; State v. Monroe, 397 So.2d 1258, 1259 (La.1981); and State v. Sonnier, 402 So.2d 650 (La.1981).
[4] Thus, the murder in State v. Culberth, 390 So.2d 847 (La.1980), if committed after the 1979 amendment, would not have been chargeable as first degree murder. In that case a woman was stabbed to death by a former boyfriend as she waited on a street corner for a bus.
[5] The Legislature's initial effort to comply with Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), involved a similar narrowing of the definition of first degree murder and a mandatory death penalty for all first degree murders under the new definition. The United States Supreme Court struck down this approach in Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), primarily because the "mandatory" feature of the procedure failed to accord discretion to the jury based on a focus on the circumstances of the particular offense and the character and propensities of the offender. The 1976 capital sentencing law, enacted after the decisions in Roberts and Gregg (see note 1, above), adopted the bifurcated trial procedure. The procedure enacted in 1976 vests the jury with sentencing discretion in the penalty phase, after consideration of both the aggravating and the mitigating circumstances.

I note, however, that in Roberts v. Louisiana, above, and in Roberts v. Louisiana, 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977) four of the eight justices now on the Court opined that a state is not constitutionally forbidden to provide for a mandatory death penalty for certain crimes. The reasoning was that "the commission of certain crimes conclusively establishes that the criminal's character is such that he deserves death", whether or not there are mitigating circumstances.
[6] Supreme Court Rule 28 requires that this court review the record to determine if the jury's finding of at least one statutory aggravating circumstance was supported by the evidence. That requirement is now automatically fulfilled when the jury's finding of guilty of first degree murder is supported by the record.
[7] I believe that one purpose of including "especially heinous, atrocious or cruel" aggravating circumstance in the statutory scheme was to separate those murderers who are disposed to take a human life for the sheer pleasure of doing so from those murderers who have killed once on the spur of the moment or on particular motivation unlikely to reoccur and would probably never kill again. That purpose was served in this case.