Johnny TAYLOR, Jr.

v.

Ross MAGGIO, Warden State Penitentiary, Angola, Louisiana and Harry Lee, Sheriff.

Civ. A. No. 84–708.

United States District Court, E.D. Louisiana.

Feb. 15, 1984.

Frank Sloan, Jefferson, La., for petitioner.

William C. Credo, III, Gretna, La., for respondents.

## MEMORANDUM OPINION

FELDMAN, District Judge.

This matter is before the Court on Johnny Taylor, Jr.'s Application for a Stay of Execution, and Petition for Writ of Habeas Corpus. Petitioner's execution is scheduled for February 29, 1984, between the hours of 12:00 midnight and 3:00 a.m.

Petitioner bases his claims for relief on essentially two grounds:

1. Petitioner was allegedly unconstitutionally convicted on forged, altered and substituted fingerprints. (Petition at page "5a.")

2. In contravention of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Petitioner did not receive a fair trial in that the State failed to provide fingerprint ev-

idence in response to counsel's specific request for scientific and other exculpatory evidence. The State allegedly violated *Brady* by destroying two fingerprints contained on one "lift" taken from the victim's car, and failed to advise Petitioner's counsel that the Fingerprint Log Book allegedly showed that the fingerprint "lifts" taken at the inception of the investigation, on February 10, 1980, were "no good", (no value for identification purposes).

Finally, the Petition also charges that "the State not only violated *Brady* by not giving the Petitioner this information, but subsequently manufactured evidence, a palmprint of Taylor's, after his arrest on June 16, 1980, and inserted this information in the Fingerprint Log Book as '½ palmprint.'" (Petition at page "5d".)

Petitioner Johnny Taylor was convicted of first degree murder, arising out of an incident discussed hereafter, in March 1981, and sentenced to death. The conviction was upheld by the Louisiana Supreme Court on October 18, 1981, rehearing denied November 19, 1982, *State v. Taylor*, 422 So.2d 109 (La.Sup.Ct.1982), and certiorari denied by the United States Supreme Court on April 18, 1982, —— U.S. ——, 103 S.Ct. 1803, 76 L.Ed.2d 367.

After certiorari was denied, Petitioner filed a mandamus proceeding, (*Johnny Taylor v. John Mamoulides, and Harry Lee, 24th Judicial District Court, Proceedings Number 278–117.*) to compel the defendants therein to allow Petitioner and his counsel to examine Petitioner's file under the Louisiana Public Records Act. LSA–R.S. 44:2. As Petitioner explains the matter, the documents mentioned in his petition became obtainable and available only after Petitioner had exhausted all of his appeals and the criminal prosecution ceased. Thereby, these records became public records under the Louisiana Public Records Act.

Petitioner subsequently filed an Application for Post Conviction Relief in the State court using, as in the instant matter, photostatic copies obtained pursuant to his mandamus action. That petition was based on the same allegations of manufactured evidence and *Brady* violations as in his present petition and was denied without hearing by the 24th Judicial District Court on January 11, 1984, and on Application for a Writ of Certiorari, Prohibition, Mandamus Stay Order and Stay of Execution, by the Louisiana Supreme Court on February 3, 1984.

The Petitioner having fully exhausted his State court remedies as to the issues raised by the instant petition, the matter is properly before the Court on the Petition for Writ of Habeas Corpus, as well as the Application for a Stay of Execution.

The Louisiana Supreme Court described the facts of the crime upon which the prosecution was based as follows:

"On February 8, 1980 the victim, David Vogler, received a telephone call around 8:45 p.m. from a black male about an automobile which Vogler had placed for sale in the parking lot of Barker's in Kenner, Louisiana. Vogler left his home in his Cadillac to show the red 1976 Buick Regal to the inquirer. He was not seen alive again by Mrs. Vogler. Around 12:45 a.m. Mrs. Vogler went to the parking lot in search of her husband along with her sister and her sister's boyfriend. The red Buick was missing; the Cadillac was parked in the lot. Mrs. Vogler looked in the Cadillac window and saw her husband's coat on the front seat. She saw two police cars stopped in the lot and asked the officers if they had seen the Buick. They assured her that they would be on the look out for it. Mrs. Vogler then returned to her mother's house where she spent the night. At 9:00 o'clock the next morning she returned to the parking lot with her brother-in-law, Larry Huesman. Huesman looked inside the Cadillac and saw blood on the upholstery. Fearing foul play, Huesman dropped Mrs. Vogler off and called the police. He met Officer Averett back at the parking lot and gave the officer Mrs. Vogler's extra set of

keys. When Officer Averett opened the trunk, he saw the body of David Vogler. An autopsy revealed that David Vogler died from multiple stab wounds."

*State v. Taylor,* 422 So.2d 109, 111–12 (La. Sup.Ct.1982).

An investigation was started by Detectives Fayard and Congemi of the Kenner Police Department. Due to the rainy weather on the night of February 8, and the morning of the 9th, the car was towed to a security garage to dry out. On February 10, technician Joseph Deidrich dusted the car for latent fingerprints. Black hairs were recovered from the ceiling of the automobile, the sun visors and the inside trunk ledge. Deidrich also vacuumed the vehicle to collect debris.

Subsequently in Alabama on June 14, 1980 local police stopped Johnny Taylor, with two companions, for traffic violation. The Petitioner was driving the missing Buick Regal. A police check of the automobile indicated it was stolen. Taylor fled from the officer under a pretext of needing to urinate while his two companions were arrested. On June 15, 1980 the two Kenner detectives drove to Millry, Alabama to interview Taylor's companions. They compared the vehicle number of the automobile to the number on the registration form to determine that it was the missing automobile Mr. Vogler was going to show for sale that fateful night. The Buick was then driven to Kenner, Louisiana.

The Louisiana Supreme Court described Taylor's arrest:

"Defendant was subsequently arrested on June 17, 1980 for an unrelated auto theft and incarcerated in Butler, Alabama. Detectives Fayard and Congemi drove to Butler on June 18 to question Taylor. Two statements were given by Taylor; neither statement satisfactorily explained how the accused came into possession of the Buick Regal. Eddie Slayton of the Alabama Bureau of Investigation took defendant's finger and palm prints and gave them to Detective Fayard. These prints, along with those taken from the Cadillac, were sent to the FBI by registered mail on June 23, 1980. Ronald Young, a latent fingerprint specialist with the FBI, compared the two sets of prints and concluded that Taylor's left palm print matched the partial palm print from the outside trunk lid based on forty points of identification. Samples of head hair taken from defendant during the interview showed similar characteristics to the hairs found in the Cadillac."

422 So.2d at 112.

## I. MANUFACTURED EVIDENCE

The essence of Petitioner's first claim is apparently that the prints sent out to the FBI as described above were somehow manipulated to produce a match—that is, that the Petitioner's conviction and sentence was unconstitutionally obtained by "the State's use of forged, altered, and substituted fingerprints." (Petition at page "5c" of the attachment.)

 It should be stated at the outset that the Fourteenth Amendment due process clause prohibits deliberate use of perjured testimony or falsified evidence by the prosecution, and that police knowledge of perjured testimony or falsified information is imputed to the prosecution. *Rivers v. Martin,* 484 F.Supp. 162, 164 (W.D.Va. 1980), and the case cited therein. However, mere conclusory allegations are not sufficient to make out a claim. Petitioner does not suggest just how the prints were altered or concocted to incriminate Taylor; he merely makes the naked charge of wrongdoing (although the State courts have specifically found he was unable to explain how he came into possession of the Buick which Mr. Vogler was going to show for sale).

 Before determining whether to order the State to answer the petition or to hold an evidentiary hearing the Court must examine the petition and all exhibits to determine whether the petition plainly fails to state a claim for habeas relief, and should, therefore, be summarily dismissed. Federal Rule for Habeas Corpus Rule 4; *See also, Allen v. Perini,* 424 F.2d 134 (6th Cir.1970) *cert. den.* 400 U.S. 906, 91 S.Ct.

147, 27 L.Ed.2d 143. In order to avoid summary dismissal the petition must set out specific, substantive facts that enable the Court to determine that there is a real possibility that constitutional error has been committed. *Aubut v. State of Maine*, 431 F.2d 688 (1st Cir.1970). The Court must also examine the petition's factual allegations and determine whether the allegations are so "palpably incredible ... so patently frivilous or false as to warrant summary dismissal", *Blackledge v. Allison*, 431 U.S. 63, 97 S.Ct. 1621, 1631, 52 L.Ed.2d 136 (1977). Although the showing a petitioner should make need only be a slight one to warrant a hearing, mere naked charges without some rational basis in supportive fact are not enough. Courts should not be intimidated into obstructing the finality of criminal justice by ordering habeas hearings based on mere conclusory or fanciful charges. Thus, if the petition is "patently frivolous" or "palpably incredible", it may be summarily dismissed.

Petitioner cites *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) as authority for requiring this Court to order an evidentiary hearing. This Court does not read *Townsend* as instructing Federal Courts to grant evidentiary hearings in every instance in which a State court fails to do so. Petitioner must make some rational showing of entitlement. If a petitioner's allegations are "incredible" or "frivolous", a hearing is not mandated. 83 S.Ct. at 759.

In his first ground for relief, petitioner alleges that he was unconstitutionally convicted on forged, altered and substituted fingerprints. This claim is based in large part upon materials obtained through a Mandamus action brought to obtain Taylor's file under the Louisiana Public Records Act LSA–R.S. 44:2.

Petitioner supports his claims with four main contentions:

1. Petitioner obtained photostatic copies of the Fingerprint Log Book, and of the Jefferson Parish Crime Scene Log Book. These two exhibits, together with testimony from the trial, and the fingerprint envelope containing the alleged "lifts" of Johnny Taylor, which was introduced into evidence at trial, are said to support the claim that as of February 10, 1980, there were no usable lifts, as shown by the notations on the various exhibits, much less any of Taylor.

2. Petitioner further alleges that the "lifts" in the Johnny Taylor case are undated, and that although technician Deidrich and examiner Rolfes both testified that it was the custom and practice to date only the fingerprint envelope, and not the prints themselves, counsel claims he has learned since trial that the lifts in the Johnny Taylor case are the lone exception insofar as they are not individually dated.

3. Petitioner further contends that because technician Deidrich testified that he could not recognize or identify two lifts, photographs of which were shown at trial, and because he testified that they did not contain his initials, and because a third lift, was thrown away "not once but three times" by examiner Rolfes, of the four lifts accounted for, three are of questionable origin. Petitioner hopes to prove that none of the lifts are in Deidrich's handwriting, and argues that since at least two are not in his handwriting the suspicion is raised that the evidence has been tampered with. Counsel claims that he is ready to prove that the envelope dated February 10, 1980 was not in fact written on February 10, 1980. His argument of tampering is based on no facts rationally connected with the possibility of tampering.

4. Finally, Petitioner through his counsel claims he can prove that the Chain of Custody form has been tampered with, that information has been supplemented, deleted and substituted. Again, no facts are given.

Petitioner contends that an examination of the fingerprint envelope will show that the Jefferson Parish Sheriff's office had an initial entry of five lifts, and that an examination of the Fingerprint Log Book shows an entry showing a total of five listed in the "No Good" column. "No Good" apparently means not usable for identification purposes in that they do not contain enough points of identification. It does not mean the prints were not Taylor's. See 422 So.2d at 114. A "lift" is a piece of plastic on which the prints are placed to preserve them. 422 So.2d at 114, n. 3. It is not the prints themselves, and that point is critical.

The envelope dated February 10, 1980, itself shows "5" in the space designated "Amount of slides containing LATENTS". Also contained on the envelope in the space designated "REMARKS", are descriptions of four lifts. See also 422 So.2d at 114.

Petitioner also claims that an examination of the Jefferson Parish Fingerprint Log Book, Exhibit 1, shows in the column "GOOD AND FILED" the insertion "½ palm", and that a total of five items are listed as no good. Because allegedly 5 items are thus listed as unusable, and because the envelope listed 5 items (specifically "slides") to begin with, the Petitioner concludes that as February 10, 1980, the date of the envelope, the Jefferson Parish Sheriff's office had no lifts that were usable, and thus no lifts of prints that could later be identified as those of Johnny Taylor's. But Petitioner is arguing lifts, not prints. A discrepancy in the number of lifts does not reflect at all on the number of good prints.

As for the notation "½ palm", Petitioner claims that this insertion is in the handwriting of L. Rolfes, the examiner, and was inserted after July 22, 1980, along with other information taken from a July 22, 1980 letter from the FBI to L. Rolfes. Once again, no facts are given.

The Court does note that the numbers in this case are confusing. The envelope refers to 5 "SLIDES", but contains only descriptions of 4 groups of prints: the Louisiana Supreme Court refers to a total of 4 original "lifts" which correspond to the 4 descriptions on the envelope. The envelope itself, in the descriptions, refers to 8 original individual prints (both finger and palm) as opposed to lifts. The Louisiana Supreme Court decision notes testimony diverged from the notes as to the number of original individual prints, with testimony referring to a total of only 7 original prints, three of which allegedly were "good", that is, usable in February of 1980 (1 finger and 2 palm) 422 So.2d at 114, and four individual prints which were unusable (all fingerprints). Two individual prints, contained on one lift, and deemed unusable, were allegedly thrown away in routine practice according to testimony examiner at trial (the two fingerprints taken from the "rear seat guard") 422 So.2d at 114.

It is not clear whether "slides" are the same thing as "lifts". This Court assumes that "slides" are the same as "lifts", and that there were only four lifts, described identically by the Louisiana Supreme Court and by the written description on the envelopes. The petition contends, of course, that the envelope and the lifts shown in the photographs used at trial were all concocted long after evidence was taken from the Cadillac, and after the arrest of Taylor. Petitioner contends that any and all lifts (no matter what prints they contained) taken before Taylor's arrest, and shortly after the crime, were found to be "no good", that is, unusable, and alleges that the notations in the fingerprint log book bear this out. Petitioner seizes on the number "5" as the relevant number. He has concluded that 5 lifts were originally taken. He apparently then concludes that the Fingerprint Log Book shows that five prints were listed as no good. In doing so, he apparently concludes that the "4" and the "1" immediately below it both apply to the same case notation. The Court, however, is of the view that the "1" listed there belongs to another case, that is listed next on the same page. And Petitioner ignores the number of good fingerprints, as opposed to lifts of prints.

The Court's examination of the reproduction of the Fingerprint Log Book shows the number 4 listed in the "no good" column, and "½ palm" written in the "good and filed" column. Petitioner argues over the number of lifts, but wholly fails to suggest how the incriminating palm print was added later or was manufactured.

Another reading of the Log Book is suggested by the Louisiana Supreme Court's decision. While the Log Book entry was still unavailable and confidential at that time, there was testimony about the prints which were considered "no good" and "good". Specifically, examiner Rolfes testified that four *prints* (not lifts) did not contain enough points for identification, and that three *prints* were determined to be good and preserved. The two prints taken from the seat belt guards, which were on one lift, were discarded by Rolfes. Thus the Log Book can be taken as reading that only four *prints* were no good and not that four *lifts* were no good. One of the good prints was the palm print which convicted Taylor.

Petitioner contends that the lifts in the Taylor case, despite the testimony as to the policy of not dating individual lifts, may be the only undated lifts in the Jefferson Parish files. While it appears that testimony at trial did establish that the lifts were undated, and that this was in accordance with policy, there is no showing that this is indeed contrary to policy, or that these undated lifts are the exception.

The technician Deidrich did testify that he did not recognize or could not identify two of the *lifts*, in the photographs shown him at trial, and that they did not contain his initials. Those were marked as "partial palmprint off inside trunk lid" (referred to as [Trial] Exhibit 32), and "Inside right passenger window" (referred to as [Trial] Exhibit 31) in the petition. Petitioner argues that the lift marked and described as "2 partial fingerprints off rear seat guard," was discarded not once but three times, according to the testimony of the examiner Rolfes, yet was introduced into evidence at trial as Exhibit 30. Even ac-

cepting this allegation as true, no issue of Federal constitutional proportions is raised without a sufficient showing that the palm-print used to place him at the scene of the murder was indeed manufactured.

Plaintiff's fourth major point in making out the first ground for relief is that the Chain of Custody has been tampered with. The Louisiana Supreme Court seems to have admitted in its direct review of his case that there were some problems with the chain of custody:

> "Although Deidrich stated that he secured the prints in his locker to be picked up by the evidence custodian, Don Carson, Rolfes testified that he received the prints from Deidrich according to routine practices."

422 So.2d at 114. The Louisiana Supreme Court however deemed this discrepancy non-fatal to the conviction:

> ■ In order to introduce demonstrative evidence, it suffices if the foundation laid establishes that it is more probable than not that the object is the one connected with the case; lack of positive identification or a defect in the chain of custody goes to the weight of the evidence rather than to its admissibility. *State v. Sam*, 412 So.2d 1082 (La.1982); *State v. Davis*, 411 So.2d 434 (La.1982); *State v. Provost*, 352 So.2d 661 (La.1977). A proper foundation was laid by the prosecution for admission of the prints. The jury was aware of the defense's intimation that a print had been lost and that only one of the three good prints matched the prints taken of defendant; it was for the jury to assess the weight to be given to this evidence."

422 So.2d at 115.

■ States have traditionally been afforded substantial latitude in fashioning their own rules of evidence and criminal procedure. *Maggitt v. Wyrick*, 533 F.2d 383, 385 (8th Cir.1979) *cert. denied* 429 U.S. 898, 97 S.Ct. 264, 50 L.Ed.2d 183. Therefore, questions relating to the admissibility of evidence are matters of State law and generally do not give rise to constitutional errors which are subject to redress in

Federal habeas corpus cases. In order to establish a denial of due process the petitioner must prove that the asserted error was so "gross", . . . "conspicuously prejudicial" . . . "or otherwise of such magnitude that it fatally affected the trial and failed to afford petitioner the fundamental fairness which is the essential of due process." *Id.* (citations omitted). (In making this determination courts must review the totality of the facts in the case before them and analyze the fairness of the particular trial under consideration. *Id.*) For the reasons set out in the Louisiana Supreme Court opinion, this Court finds that the defects in the chain of custody alone do not rise to a constitutional deprivation. See *White v. Solem*, 481 F.Supp. 925 (D.C.S.D.1979).

## II. *BRADY* VIOLATIONS

■ In ground two of his petition, Petitioner claims that he was denied a fair trial in contravention of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) in that the State destroyed fingerprint evidence prior to trial and did not provide it for inspection by Taylor's counsel as required by *Brady.*

Petitioner's counsel allegedly specifically sought any information, scientific or otherwise, that was exculpatory and that the State responded by giving Petitioner's counsel a copy of a July 22, 1980 letter from the FBI advising that one of the lifts was that of Johnny Taylor, Jr. The State, in addition, allegedly failed to provide information that none of the original lifts were of any value for identification purposes, as allegedly shown by the entry in the Fingerprint Book, and that the State subsequently manufactured evidence, a palmprint of Taylor's, after his arrest on June 16, 1980, and inserted this information in the Fingerprint Log Book as "½ palmprint".

In those cases in which the prosecution has knowingly used false or perjured testimony reversal is required if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. Further, if the defense made a specific request for a particular item that was not disclosed—reversal is required if the suppressed evidence might have affected the outcome of the trial. *United States v. Agurs*, 427 U.S. 97 at 104, 96 S.Ct. 2392 at 2398, 49 L.Ed.2d 342 (1976); see also *Sellers v. Estelle*, 651 F.2d 1074 (5 Cir.1981).

■ But petitioner has failed to make a minimally credible claim establishing that the prosecution knowingly used false or perjured testimony. Again, all the Court has is the naked charge.

As to the alleged destruction and nondisclosure of two fingerprints, the Court agrees with the analysis given by the Louisiana Supreme Court on direct review:

"No *Brady* violation has been shown by defendant. All pertinent prints were turned over to the defense, including those that did not match defendant's prints. The fingerprint technician merely threw away prints which were of no value, either as exculpatory or inculpatory evidence because they contained insufficient points for identification purposes."

422 So.2d at 114.

In short, unusable or unreadable prints, which might have been Taylor's, is not exculpatory material.

As to the nondisclosure of the Fingerprint Log Book entry, the Court finds that is similarly nonexculpatory, and that it is not material in that it would not have affected the outcome of the trial. The Court simply does not find that the petition puts forth even a minimally credible allegation showing that the palmprint used to place the Petitioner at the scene of the crime was concocted long after the investigation first attempted to lift prints from the victim's Cadillac, at the time following the Petitioner's arrest.

The Court having examined the petition and its exhibits, and having procured better copies of Exhibits 1 and 2 through the Jefferson Parish Sheriff's office, which copies are to be made sealed exhibits in this record, and having examined the original fingerprint envelope photocopied for Exhibit 1 which also has been made a sealed

exhibit to this record, finds the petition so "palpably incredible" as to warrant dismissal. *See Blackledge v. Allison*, 431 U.S. 63, 97 S.Ct. 1621, 1631, 52 L.Ed.2d 136 (1977). Accordingly, the Petition for Habeas Corpus and the Application for a Stay of Execution is denied and the Court refuses to issue a Certificate of Probable Cause.